**Fernando LANCON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 04–05–00164–CR.**

Court of Appeals of Texas, San Antonio.

Dec. 27, 2006.

Discretionary Review Granted June 6, 2007.

591 (Tex.App.-Houston [14th Dist.] 2006, pet. ref'd).

J. Eduardo Pena, Laredo, for appellant.

Jose M. Rubio, Jr., Webb County Dist. Atty., Laredo, for appellee.

Sitting: SARAH B. DUNCAN, Justice, PHYLIS J. SPEEDLIN, Justice, REBECCA SIMMONS, Justice.

## MEMORANDUM OPINION

Opinion by SARAH B. DUNCAN, Justice.

Fernando Lancon appeals the judgment convicting him of murder, attempted murder, and deadly conduct. We hold the evidence is factually insufficient to support the jury's verdict and therefore reverse the trial court's judgment and remand the cause for a new trial.

### STATEMENT OF THE CASE

Jorge Zuniga, Alfonso Villarreal, and Fernando Lancon were charged with the murder of eleven-month-old Federico Soliz III, the attempted murder of Hector Dominguez, and deadly conduct by knowingly discharging a firearm at Dominguez or in his direction. After Lancon was certified to stand trial as an adult, they were tried

to a jury, which found Zuniga not guilty on all three counts and further found Villarreal (who admitted his complicity) and Lancon guilty as charged. Lancon was thereafter sentenced to incarceration in the Texas Department of Criminal Justice—Institutional Division for twenty-five years for murder, fifteen years for attempted murder, and ten years for deadly conduct. Lancon appeals.

## FACTUAL SUFFICIENCY

Fernando challenges the factual sufficiency of the evidence in one respect only—to support the jury's implied finding that he was the shooter involved in the events on June 11, 2003. We will therefore first set out the standard of review and then proceed to lay out the facts that are basically undisputed, the evidence supporting the jury's verdict, and the evidence conflicting with it.

### *Standard of Review*

 As the Texas Court of Criminal Appeals recently explained, "[t]he basic ground rules for post-*Clewis*[1] factual-sufficiency review were well-articulated in *Cain v. State*"[2]:

[1.] First, the appellate court should be mindful that a jury has already passed on the facts, and convicted, and that the court should never order a new trial simply because it disagrees with the verdict, but only where it seems to the court to represent a manifest injustice, though supported by legally sufficient evidence.

[2.] Second, the appellate court should support its judgment that a manifest injustice has occurred by explaining in exactly what way the

State's evidence, while legally sufficient, is nevertheless too weak to withstand scrutiny, or in exactly what way it perceives the conflicting evidence greatly to preponderate against conviction.

[3.] Third, although viewing *all* the evidence, as it would in a legal sufficiency analysis, the appellate court should review that evidence, not in the light most favorable to the verdict, but in a neutral light.

*Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim.App.2006) (footnotes omitted). The *Watson* Court also approved the "substantive adjustment[ ] to these basic ground rules" set forth in *Johnson v. State*, 23 S.W.3d 1, 11 (Tex.Crim.App.2000), which "broke down factual-sufficiency analysis into two prongs." *Watson*, 204 S.W.3d at 414. "The first prong asks whether the evidence introduced to support the verdict, though legally sufficient, is nevertheless 'so weak' that the jury's verdict seems 'clearly wrong and manifestly unjust[.]'" *Id.* at 414–15 (quoting *Johnson*, 23 S.W.3d at 11). "The second prong asks whether, considering conflicting evidence, the jury's verdict, though legally sufficient, is nevertheless against the great weight and preponderance of the evidence." *Watson*, 204 S.W.3d at 415. It is this second prong that is the basis for our decision in this case.

### *Undisputed Facts*

On June 11, 2003 at 9:20:43 p.m., the Laredo Police Department's 911 operator received a call concerning a shooting at the home of Federico Soliz, Sr. at 2809 Logan Avenue. Minutes before the shooting, a purple or maroon, four-door car equipped with tinted windows that were half-way

---

1. *Clewis v. State,* 922 S.W.2d 126 (Tex.Crim. App.1996).

2. *Cain v. State,* 958 S.W.2d 404, 407–08 (Tex. Crim.App.1997)

down stopped in front of the Soliz home. Alfonso Villarreal exited the car from the rear passenger seat, and either Fernando Lancon ("Moiky")—according to the State's witnesses—or his shorter but very similar-looking younger brother Eduardo ("Wayo")—according to the defendants and their witnesses—exited the car from the front passenger seat and fired two shots from a .40 caliber automatic gun at or in the direction of Hector Dominguez, who was, moments earlier, standing on the sidewalk in front of the Soliz home with his friends Daniel Diaz and Fernando Soliz.[3] One of the shots traveled through the home's wall and into the living room, where it fatally wounded eleven-month-old Federico Soliz III. The entire incident lasted less than a minute.

At 9:27 p.m. officers were dispatched to the scene. Detective Greg Cantu III, the chief investigator arrived at approximately 9:30 p.m. When Detective Cantu asked Dominguez who had shot at him, Dominguez replied Fernando Lancon and that he lived on Kearney Street. At 9:26, 911 received a call indicating a possible location for the suspects at 1418 Kearney Street, which is where Fernando lived with his grandmother, Maria Villarreal. Immediately after Dominguez identified Fernando Lancon, Detective Cantu sent an officer to 1418 Kearney to see if he could locate Fernando Lancon or the maroon car, but neither was found. Detective Miguel Angel Rodriguez, a crime scene investigator, arrived at the scene at 9:34. As Rodriguez exited his patrol car, Dominguez pointed at a white Cadillac driving on Lyon and shouted to Detective Cantu, "There he

goes; there goes Fernando; there they go in the white car."[4] At 9:35, dispatch was notified to place a lookout for the Cadillac. A few minutes later, Detective Rodriguez saw a white Cadillac stopped behind another vehicle at the stop sign at the corner of Logan and Lyon, one block from the scene of the shooting; the occupants of the white Cadillac were talking to an another male standing outside the car. As Detective Rodriguez approached the car and told its two occupants to let him see their hands, Fernando said "Wait. What's going on? Wait. I didn't do anything." At 9:39 p.m., the occupants of the white Cadillac, Jorge Zuniga and Fernando Lancon, were detained. Detective Cantu immediately administered gunshot residue kits on both suspects's hands and took their clothes. Fernando Lancon was wearing jeans, a plaid Tommy Hilfiger shirt, and no cap. Shortly thereafter Zuniga and Fernando Lancon were taken to the Webb County Juvenile Detention Center.

Sometime after 11:00 p.m. the night of the shooting, Dominguez and Diaz gave statements, which were videotaped because neither was able to read or write. Dominguez and Diaz were also shown six-person picture lineups and, since they had already identified Fernando Lancon as the shooter, asked only if Fernando was in the lineup. Both quickly identified Fernando as the shooter.[5] The next day Dominguez and Diaz were again shown picture lineups and this time identified Jorge Zuniga, whom they did not know by name, as the driver. They also identified Alfonso Villarreal as the third person involved. Fer-

---

3. The casings recovered at the scene of the shooting were .40 caliber and manufactured by Smith & Wesson.

4. Detective Cantu testified Dominguez told him Fernando Lancon was in the white Cadillac, but Dominguez testified he did not see who was in the white car and denied telling

Dominguez that Fernando was driving the car.

5. At trial, Dominguez testified he did not recognize or identify anyone in the lineups that night.

nando Soliz also made a statement naming Fernando Lancon as the shooter, however, Soliz did not identify Fernando in a line-up.[6]

The police looked for but never found the car or the gun used in the shooting.[7] Indeed, the only physical evidence linking Jorge Zuniga to the shooting were a couple of particles of gunshot residue found inside his front jeans pockets and on the back of his left hand; and no physical evidence was found linking Fernando Lancon to the shooting. Detective Cantu's theory of the crime was that, in the eighteen minutes after the shooting, Fernando Lancon returned to his home at 1418 Kearney, approximately six blocks and a one minute drive from the shooting, changed cars and clothes, disposed of the gun, washed his hands (if he had not been wearing gloves), dropped off Villarreal, and returned with Zuniga to the scene of the shooting. However, Cantu admitted at trial there is no physical evidence to support his theory.[8] In their search of the white Cadillac, the police found no clothes other than what the suspects were wearing, no baseball cap, and no weapon. The jury's implicit finding that Fernando Lancon was the shooter thus rests entirely upon the testimony of Hector Dominguez and his friend Daniel Diaz, who were fifteen and fourteen years old, respectively, at the time of the shooting.

### Evidence Supporting the Verdict

Dominguez testified that, after he started an argument at the neighborhood recreation center with Alfonso Villarreal (whom Dominguez knew from "the street"), Villarreal got into a purple four-door car being driven by Jorge Zuniga (whom Dominguez knew from school). Fernando Lancon was also in the car. Shortly thereafter,[9] Dominguez and Diaz walked the one block from the recreation center to the home of their friend Freddie Soliz. After Dominguez and Diaz knocked on the door, and Freddie came out, Villarreal arrived in the purple four-door car and stopped at Freddie's house. Villarreal asked if Dominguez wanted to fight; and Dominguez said he did. At that point, Dominguez testified, Villarreal exited the rear passenger seat of the car, came around it, and said to Fernando Lancon, who had exited the car from the front passenger seat: "Shoot that guy." Dominguez then heard Fernando Lancon cock the large black gun

6. During trial, the State advised the defense attorneys on the record, but outside the hearing of the jury, that Fernando Soliz told the prosecutor he cannot identify Fernando Lancon as the shooter.

7. Although it is undisputed that a partial license plate number (five of the six) was reported to the 911 operator, Detective Cantu did not ask for a transcript of the 911 call or otherwise acquire that information.

8. The questions and Detective Cantu's answers about his theory of the crime assumed all this occurred in an eighteen minute period; however, the evidence established that in fact only fourteen minutes passed between the 911 call and when Dominguez saw the white Cadillac driving on Lyon.

9. Either Dominguez was somewhat confused about the timing of the events that night or confusion arose out of the Spanish to English translations required for him to testify. He testified on direct examination that he was at the recreation center from 6:00 to 10:00 p.m. but that he was not there at 9:00 p.m. On cross-examination by Lancon's attorney, Dominguez testified that he got to the Soliz home at 7:00 p.m.; the purple car arrived at 7:30 p.m.; and the shooting occurred at 8:30 p.m. Later, on cross-examination by Villarreal's attorney, Dominguez testified that he knew the shooting occurred at 7:30 p.m. because Diaz had a watch. Diaz testified he did not remember what time he and Dominguez arrived at the Soliz home, although it was already dark, and he was not wearing a watch that night.

he held in his right hand. Either when Dominguez saw the gun or when he heard the gun being cocked, Dominguez ran to the right of the house and into the backyard and hid. However, Dominguez testified, he saw Fernando Lancon pull the trigger and shoot. Dominguez believed Fernando Lancon was trying to kill him. Dominguez testified he did not remember whether the shooter was wearing a long or short sleeved shirt or if he was wearing shorts or pants. Moments later, he testified the shooter was wearing a white shirt, blue shorts, and a blue New York Yankees cap with the visor turned to the front, and had short hair with short bangs on his forehead.

Dominguez testified he was shown three lineups the night of the shooting and at first testified he did not identify or recognize anyone. Dominguez later agreed that he identified Fernando Lancon in a lineup as the shooter and he told the officer Jorge Zuniga was the driver. Dominguez testified he was 100% sure it was Fernando Lancon, not Eduardo Lancon, who shot at him. Dominguez testified he never saw Eduardo Lancon, whom he has known since they were in sixth grade together, that night. He saw the white Cadillac that night and knew it was Fernando Lancon's.

Daniel Diaz testified that he and Dominguez were on the sidewalk in front of the Soliz home talking to Freddie's brother Nando when they saw a four-door dark maroon car drive up, park in the middle of the street, and two people get out. One Diaz knew to be Fernando Lancon, whom Diaz had seen somewhere before; the other Diaz did not know. This person told Fernando Lancon to shoot Dominguez. Fernando Lancon then cocked a black gun and fired two shots at Dominguez. Dominguez ran; but Diaz stayed on the sidewalk. After the shooting, Fernando Lancon and the other person got back in the

car and drove off. Diaz did not see who was driving. Diaz later saw the police stop Fernando Lancon's white Cadillac and pull Lancon out of the car. Diaz testified that after the shooting, he was shown some lineups and identified Alfonso Villarreal as the person standing next to the shooter and Fernando Lancon as the shooter. When shown a picture lineup at his home on June 12, the day after the shooting, Diaz identified Zuniga as the driver of the maroon car. According to Diaz, the shooter was wearing a white shirt and pants but no cap.

The State also called Kimberly Sanchez, who was also at the recreation center the evening of June 11, 2003, with her friends, sisters Monica and Melissa Soliz. Sanchez saw Dominguez and Villarreal talking and arguing that night; but she was too far away to hear what they were saying. After seeing Dominguez leave through the back entrance, she saw Villarreal on the phone and heard him ask for "Moiky." Sanchez does not know who "Moiky" is; nor does she know if Villarreal actually talked to him that night. She and Melissa then saw Villarreal leave through the front entrance and get into a maroon car. About five minutes after Dominguez left, Sanchez and her friends also exited the front entrance and started walking towards the Soliz home. She saw the maroon car stop in front of the Soliz home and a guy in a white shirt get out of the car. When Sanchez and her friends heard a shot, they got scared and returned to the recreation center.

Monica Soliz saw Villarreal inside at the recreation center but not the person to whom he was talking. Nor did she see Villarreal leave the recreation center or get into a car. Monica, her sister Melissa, and Sanchez left the recreation center around 9:10 p.m. About five minutes later, they were passed by a maroon car, which

stopped in front of the Soliz home. Monica saw Villarreal and someone she did not recognize get out of the maroon car. When Monica heard two gunshots, she got scared and ran back to the recreation center.

### Evidence Contrary to the Verdict

Jose Gonzalez, who was twenty-one years old at the time of trial, testified that he is the cousin of Fernando and Eduardo Lancon and Alfonso Villarreal. On June 11 Jose picked up the maroon Contour belonging to his mother Ava Maria Gonzalez from the repair shop and drove first to WalMart and then to the home of his aunt, Lydia Fernandez, at 2214 Hendricks. When Jose drove up, his aunt and his cousin Eduardo came out to his car and said that his cousin Alfonso was getting beaten up and Jose should pick him up at the recreation center. Jose testified that after he and Eduardo picked up Alfonso and were on their way back to Lydia Fernandez's home, they saw two guys, one fat and one skinny, at a house in the middle of the block on Logan. As they passed the house, while Jose was driving approximately ten miles an hour, Eduardo and then Alfonso jumped out of the car and started arguing with one of the guys. Then Eduardo started shooting. Jose, who testified he had not known Eduardo had a gun or was going to shoot, thought the other guys were shooting at him. After the shooting, Jose dropped Eduardo and Alfonso off at Mrs. Fernandez's home. He does not know where they went after that; he just did not want to be with them. He has not talked with Alfonso since June 11 and has not even seen Eduardo since that night. He never talked with anyone, including the police, about that night. When he heard two days after the shooting that Fernando had been arrested, he knew it was important to tell the police that Eduardo, not Fernando, was the

shooter and they had the wrong guy; but he believed they already knew because he had heard they were looking for Alfonso. Jose spent the rest of that night at home with his mother. Jose came to court not to lie but to tell the truth; and it is not true his grandmother asked him to testify on Fernando's behalf.

Jose's mother, Ava Maria Gonzalez, who was fifty at the time of trial, testified that she is the sister of Rosalinda Cruz, the mother of Fernando and Eduardo Lancon. Mrs. Gonzalez's other sisters are Leticia Martinez, Lydia Fernandez, and Yolanda Villarreal, who is the mother of Alfonso. Mrs. Gonzalez identified the maroon Ford Contour as her car, which she owned on June 11, 2003. She also identified an invoice dated June 11, 2003 for repairs to her car. According to Mrs. Gonzalez, she and her son Jose were threatened or intimidated when they came to court the previous Tuesday by Jose Tellez of the district attorney's office. Tellez told her that because she owned the car, she could be locked up and put in jail if she and her son Jose were trying to say things that were not true. On cross-examination, Mrs. Gonzalez admitted that she had told the prosecutor that when her son Jose got home the night of June 11 at 7:45 p.m., she asked for the keys and told him to wash for dinner, and Jose never left the house that night. She did not recall telling them that her mother, Maria Villarreal, was pressuring her to pressure her son to admit some involvement in the shooting.

Lydia Fernandez testified that she was at her home with her mother Maria Villarreal and her sister Rosalinda Cruz on June 11, 2003 when Alfonso called and said he needed someone to pick him up at the recreation center. Eduardo Lancon was also there at her home. Jose and Eduardo left in Mrs. Gonzalez's maroon Contour to pick up Alfonso. When they returned,

Jose dropped Alfonso and Eduardo off and then left. Mrs. Fernandez testified that Eduardo and Alfonso looked scared and she asked what they had done. Eduardo told her he had shot a guy and saw him fall on the floor. he said Alfonso had problems with the people who lived at that house and it had to be done because they were tired of them picking on Alfonso. Lydia did not believe him. But then a patrol car drove up and an officer asked where Alfonso was. When she asked the officer what had happened, he said they had Fernando in custody and just needed Alfonso for questioning. Although Eduardo and Alfonso were still at her home, she told the officer Alfonso was not there because she did not know what had happened and did not believe Eduardo. When she asked if someone had been shot, the officer told her an eleven-month-old baby. She started crying and told the officer Alfonso was not there. Mrs. Fernandez testified she then went back inside the house and Eduardo was scared because he thought he had shot a guy and instead had shot a child. On cross-examination, Mrs. Fernandez testified that neither she nor her mother nor her sisters ever made a statement to the police because they never asked. The police had already been told Eduardo was the shooter, which is why they raided her home looking for him and

the gun later; but the police said there was not enough evidence to arrest Eduardo. Although she lied to the police that night, she was not lying at trial.

Alfonso's mother, Yolanda Villarreal, who was thirty-six at the time of trial, testified that she was at the park with her other three sons from about 7:30 to 8:00 p.m. and then went to her sister Lydia's home. Lydia, her sister Leticia, and Eduardo were all there. Mrs. Villarreal heard Eduardo say he went to the Soliz's and shot at the house. On June 16, 2003 at 12:49 p.m., she gave Detective Greg Cantu a statement that Eduardo told her he was the one who shot at the house on June 11; she does not know why her written statement indicates she heard Eduardo's admission of guilt on June 14 or why Cantu did not put that it occurred on June 11. On re-direct, Mrs. Villarreal testified that Eduardo admitted both on June 11 and on June 14 that he was the shooter. She testified the police did nothing about it.[10] On re-cross, Mrs. Villarreal testified she does not know why both dates are not in her statement. Leticia Martinez testified that she was at Lydia's home on June 11 and also heard Eduardo tell Alfonso that he went to shoot at the Soliz family's house and that he would take the blame because he had done it.[11]

---

10. Actually, on June 16, 2003, in response to Mrs. Villarreal's statement, the police executed a search warrant at 2214 Hendricks, which is one of the areas in town where the police wear bullet-proof vests. Although the police recovered a Ruger assault rifle mini 14.223 and a sixty-round clip, a High Point assault rifle with a telescope, a bullet-proof vest, and two .40 caliber magazines that could have been used in the murder weapon, the police did not find a .40 caliber weapon. The police arrested Conrado Antonio Fernandez, 45; Alfonso Villarreal, Sr.; Rosalinda Cruz, 42; Joe Luis Rodriguez, 17; Lionel Fernandez, 16; and Eduardo Lancon, 14.

11. However, when Fernando Lancon's attorney called Eduardo to testify, he invoked his Fifth Amendment right to remain silent outside the jury's presence. *See* U.S. Const. amend. V ("No person ... shall be compelled in any criminal case to be a witness against himself...."); *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *see also* Tex.R. Evid. 513(a) ("Except as permitted in Rule 504(b)(2) [regarding the spousal privilege], the claim of a privilege ... is not a proper subject of comment by judge or counsel, and no inference may be drawn therefrom."); *McKaine v. State*, 170 S.W.3d 285, 293 (Tex.App.-Corpus Christi 2005, no pet.) ("A witness's assertion of his or her

Fernando Lancon testified that he was eighteen at the time of trial and was married to Erica Arejon, with whom he had a one and one-half year old little girl. Although his brother Eduardo was raised by their mother and lived with their Aunt Lydia, Fernando has always lived with his grandmother, Maria de Jesus Villarreal. Fernando testified he is left-handed and demonstrated his assertion by writing his name. On June 11, 2003, Fernando was working at the Lancon Tire Shop, which is owned by his uncle. He testified that after work, he drove to the home of his sister Rosa Maria in his 1994 white Cadillac, arriving around 6:00 p.m., leaving around 8:00 p.m., and picking up Jorge Zuniga around 9:00 p.m. at the corner of Martin and Lyon. Jorge's mother saw Fernando when he picked up her son. He did not see his cousins Alfonso Villarreal and Jose Maria Gonzalez that day. After he picked up Jorge Zuniga, they went to the home of their friend Jose Luis Rodriguez; but his mother said he was not at home. As they were leaving the neighborhood on Logan to go wash his car on San Bernardo, they saw a lot of cops and made another right turn, circling the block twice and seeing a lot of activity approximately one-half block up. Then, when they saw one of Jorge's friends, whose name Fernando does not know, and stopped to asked him what happened, the police told him to stop, put his hands up, and asked "What in the hell have you done." Fernando asked "What's going on?" because he did not know. Fernando testified he drove no car other than his white Cadillac on June 11 and did not shoot anyone or fire shots at the Soliz residence. Fernando never spoke with Detective Cantu and never said his brother was the shooter because he did not know that. Fernando is 5′8″ or 5′9″ tall.

Jorge Zuniga testified that on June 11, 2003, after an appointment at the Texas Workforce Commission and delivering employment applications at various fast food places, he went to his home at 2816 Martin. When Fernando Lancon came over, they talked for a while and then decided to go cruising. Jorge went back inside and changed clothes; and they left his house around 9:00 p.m. Jorge testified they stopped first at the home of Fernando's friend, Jose Luis; but his mom came outside and said he was not home. They next went to the recreation center, where they saw Melissa Maynard; then they continued driving and stopped to talk to his friend, Juan Polanco. Fernando asked Juan what was going on. Then the police came and told them to put their hands on the dashboard. Jorge was scared and complied. The police then removed him from the car and patted him down. The officer asked what the hell did Jorge and Fernando do and told them it was stupid and they would find out later. Jorge did not respond because he did not know what was going on. The officers took his clothes and he was naked except for his underwear. As he was being transported to the juvenile detention center, he was shot gang signs. An investigator told him he had messed up his life; when Jorge asked in what way, he was told he would find out later. Jorge was in the juvenile detention center for four months. One detective told Jorge he had ten minutes to tell him what was going on and if he did not, they would just leave him there. Jorge testified that he and his mother cannot afford a vehicle; and he did not drive a vehicle to 2809 Logan on June 11.

Fifth Amendment rights and refusal to testify is not evidence and the jury is not allowed to draw any inferences from such actions.") (citing Rule 513 and *Torres v. State,* 137 S.W.3d 191, 198 n. 3 (Tex.App.-Houston [1st Dist.] 2004, no pet.)).

He testified he was not with Alfonso Villarreal that night and did not even know him in June 2003; he did not associate with Alfonso or Eduardo; and he did not have anything to do with this incident. Because he was alleged to have been involved, after he got out of detention, he was sent to an alternative school, where he learned to play chess. He had previously gotten As and Bs in his regular school.

Alfonso Villarreal testified that on June 11, 2003, when he was eighteen years old, he was at the recreation center playing basketball from 5:00 to 8:30 p.m. with friends. At approximately 8:45 p.m. he saw Hector Dominguez, who tried to fight with him, and a friend of Dominguez's, whose name Villarreal does not know. Villarreal told Dominguez he did not want any problems; but Dominguez said he was going to beat Villarreal up. After Dominguez left, Villarreal called his Aunt Lydia's house because Dominguez had threatened to beat him up and kill him when he went outside. His cousin Jose Gonzalez then came and picked Villarreal up in front of the gym. Jose was driving his mother's maroon car and Eduardo Lancon was in the front passenger seat. When Jose asked Villarreal where to drop him off, Villarreal said his mother's house. But they did not go to his mother's house because Eduardo said to first drop him off at his friend's house. As they drove by 2809 Logan, Hector Dominguez called out to Villarreal that he was a son of a bitch. Villarreal testified he got out of the car and Dominguez said, "let's go one on one." Villarreal said "come on" and then saw Eduardo with a gun shooting at Dominguez. Dominguez ran; but his friend stayed put. While Eduardo shot at Dominguez, Villarreal stayed there, scared.

When Villarreal went back to the car, Eduardo said "I hit him. I hit him." Villarreal testified that was when he first learned Eduardo had a gun and that neither Villarreal nor Gonzalez or anyone else told Eduardo to shoot. After the shooting, Jose dropped Villarreal and Eduardo off at their Aunt Lydia's house. Villarreal's mother, grandmother, and aunts were all there. On cross-examination, Villarreal testified that, on June 11, 2003, Eduardo was fourteen or fifteen years old, while Fernando was eighteen.[12] Villarreal denies calling and asking for either Moiky or Wayo; he called Lydia's house asking for anyone. Villarreal did not know Daniel Diaz before June 11, 2003 and had no problems with him. Villarreal was not afraid of Dominguez; but he did not want to fight him, although he could have. Dominguez did not force Villarreal to get out of the car; Villarreal was just going to check on who had screamed at him. Villarreal testified he did not want Dominguez dead; it was just that Eduardo had problems with Dominguez and said he wanted to take care of business. Villarreal testified neither Fernando nor Zuniga was with them that night. Villarreal was arrested on August 23, 2004; for fourteen months before he was arrested, he was "on the other side" in Mexico.

### Discussion

■ After reviewing all the evidence in a neutral light, we hold the evidence supporting the jury's implicit finding that the shooter in this tragic incident was Fernando Lancon, rather than Eduardo Lancon, is greatly outweighed by the contrary evidence. *See Cain*, 958 S.W.2d at 407. We arrive at this "'predominantly intuitive

---

**12.** In fact, Fernando Lancon was born September 23, 1986 and was therefore sixteen on June 11, 2003.

'judgment' "[13] based on the objective unreliability of Dominguez's and Diaz's testimony that Fernando Lancon was the shooter coupled with the weight and quantity of the evidence that the shooter was not Fernando but Eduardo Lancon.

Both Dominguez and Diaz testified that at the time of the shooting, although there was some light was coming from the house and a street lamp at the corner; it was dark or at least getting dark; the incident happened very fast; Dominguez at least was afraid of getting shot; and Eduardo and Fernando looked alike. Certainly Dominguez and most likely Diaz[14] had smoked marijuana that day and were under its influence when the incident occurred, which one of the State's expert witnesses, Dr. Kimberly Molina, testified can delay mental activity and thinking and change perception.[15] Although Dominguez testified on direct examination that he was 100% sure that Fernando Lancon was the shooter, he later admitted that because it was dark and happened very fast, and he was afraid of getting shot, he did not get a good look at the shooter. Similarly, although Diaz testified on direct and re-direct examination that he got a good look at the shooter's face and was sure it was Fernando Lancon, he admitted on cross-examination that he did not know if he mistook Fernando for Eduardo, admitted they look a lot alike, it was dark, the incident happened very fast, and it was possible he saw Eduardo and not Fernando.

Dominguez also testified on direct examination that the purple car was parked next to the curb in front of the Soliz home, where the pickup in the photograph of the Soliz home was located and that he was three feet away from the shooter; but he later testified that the shooter shot from a distance that was the width of two vehicles—the purple car and a white Cadillac that he testified was parked next to the curb in front of the Soliz home during the entire incident—a distance that would be in excess of ten feet. Notably, no one else testified that a white Cadillac was parked in front of the Soliz home that night; and the photograph of the scene taken shortly after the shooting reflects a pickup truck was parked there. When asked to explain the discrepancy, Dominguez testified the photograph was inaccurate.

Dominguez was also certain that the gun was in the shooter's right hand. But Fernando Lancon testified and demonstrated by writing his name that he is left-handed. Dominguez first testified that the shooter was wearing a blue New York Yankees cap with the visor turned to the front and later testified that it was the driver who was wearing a blue cap; but Diaz was sure the shooter was not wearing a cap. Dominguez also testified that, although he saw a white Cadillac pass down the street from the Soliz home, he did not see who was in the car and did not tell the police that Fernando was driving the car; but Cantu testified that when he asked Dominguez who had shot at him, Dominguez replied Fernando Lancon and then said "There he goes; there goes Fernando; there they go

---

**13.** *Johnson,* 23 S.W.3d at 7 (quoting William Powers and Jack Ratliff, *Another Look at 'No Evidence' and 'Insufficient Evidence,'* 69 TEXAS L.REV. 515, 519 (1991)).

**14.** Diaz testified that although he did not recall whether he smoked marijuana on June 11, he smokes it everyday; and Dominguez testified both he and Diaz were under the influence of marijuana when the shooting occurred.

**15.** We note that the one eyewitness who was not under the influence of marijuana that night—Fernando Soliz—first named Fernando Lancon as the shooter but did not pick him out of a lineup.

in the white car." Likewise inconsistent was Dominguez's testimony regarding the timing of the events that night and that he was sure of the times to which he testified because Diaz was wearing a watch; however, Diaz testified he was not wearing a watch that night. More troubling is Dominguez's testimony that he ran to the right and back of the house either when he saw the gun or heard it being cocked and, when the shooter started to fire, he was "in the back of the house"; but he also testified that he saw Fernando Lancon pull the trigger and shoot. Finally, although both Dominguez and Diaz testified that Zuniga was the driver, the jury acquitted Zuniga—not surprising perhaps in light of Jose Gonzalez's testimony that he was actually the driver and Diaz's admission that in fact he did not see not see the driver and picked Zuniga out of the photographic lineup because "some witness told [him] [Zuniga] was driving."[16] Similarly troubling is Dominguez's testimony that he picked Fernando Lancon out of the lineup because knew what Fernando looked like, not necessarily because he remembered Fernando from shooting.[17]

These weaknesses and inconsistencies in Dominguez's and Diaz's testimony certainly detract from its reliability. But, standing alone, these factors would not convince us that the evidence is factually insufficient to support the jury's implicit finding that Fernando, rather than Eduardo, was the shooter. *Compare Johnson*, 23 S.W.3d at 8 (holding that "[a] factual sufficiency analysis can consider only those few matters bearing on credibility that can be fully determined from a cold appellate record"

but affirming court of appeals' judgment reversing because of factual sufficiency because record revealed and court of appeals recognized that "accuracy of victim's identification of appellant was questionable because of the adverse conditions that existed during her brief and obstructed view of the assailant") *with Cain,* 958 S.W.2d at 409 (noting that fact that victim was "drunk, had troubling remembering the assault, and had been extremely intoxicated previously" "bear on the amount of credibility [the victim's] testimony should receive"). But what does convince us that the evidence is factually insufficient to support the jury's verdict is viewing the eyewitnesses' testimony—complete with the weaknesses, inconsistencies, and equivocations outlined above—in light of the consistent, detailed testimony set forth above from the defense witnesses, including two of the three participants who admitted their complicity in the shooting (Villarreal and Gonzalez) and identified Eduardo Lancon as the shooter, and the aunts of both Eduardo and Fernando (Yolanda Villarreal, Lydia Fernandez, and Leticia Martinez), each of whom testified that she heard Eduardo admit to having been the shooter moments after the shooting took place. Both factors, taken together, convince us that reversing the judgment against Fernando Lancon and ordering a new trial is "necessary to arrest the occurrence of a manifest injustice." *Johnson,* 23 S.W.3d at 9.

## Exculpatory Evidence

█ Lancon next argues a new trial is warranted because the State failed to dis-

---

16. Dominguez's identification of Zuniga as the driver was also called into question by the testimony of Investigator Jorge Luis Maldonado, who testified that during Dominguez's videotaped interview on the night of the shooting Dominguez stated that all he could see of the driver of the maroon car was his cap; he did not see his face.

17. Neither Dominguez nor Diaz was ever shown a lineup that included Eduardo Lancon because Cantu believed his theory was so solid he perceived no reason to include Eduardo Lancon in the lineups or even to question him regarding the shooting.

close the existence of Jessica Camacho's tape-recorded statement telling a newspaper reporter that Villarreal told her the shooter was not Fernando but Eduardo Lancon. We disagree. Even if this recording were admissible, the substance of the statement mirrors the testimony of others who testified at trial, including Villarreal himself, and thus fails to establish that, "in light of all the evidence, it is reasonably probable that the outcome of the trial court have been different had the prosecutory made a timely disclosure." *Hampton v. State*, 86 S.W.3d 603, 612 (Tex.Crim.App.2002).

### PHOTOGRAPHS

Finally, Lancon argues the trial court reversibly erred in admitting into evidence two 4"x6" color photographs of eleven-month-old Federico Soliz III. We again disagree. The photographs, which were offered by the State to show the entry and exit wounds, correctly depict the child's fatal injuries, as described by several witnesses at trial. Under these circumstances, the trial court acted within the ambit of its discretion in admitting the photographs. *See, e.g., Etheridge v. State*, 903 S.W.2d 1, 21 (Tex.Crim.App.1994) (holding that "gruesome and detailed" color autopsy photographs were admissible), *cert. denied*, 516 U.S. 920, 116 S.Ct. 314, 133 L.Ed.2d 217 (1995); *Brown v. State*, 696 S.W.2d 913, 914 (Tex.Crim.App.1985) (holding that if a verbal description of what is depicted in a photograph is admissible, the photograph is likewise admissible).

### CONCLUSION

Because our neutral review of all the evidence, both for and against the jury's finding, demonstrates that the proof of guilt, although adequate if taken alone, is nevertheless against the great weight and preponderance of the evidence, we reverse the trial court's judgment and remand the cause for a new trial.

Dissenting opinion by REBECCA SIMMONS, Justice.

REBECCA SIMMONS, Justice, dissenting.

Because I apply *Watson v. State*, 204 S.W.3d 404 (Tex.Crim.App.2006), differently than does the majority, I must respectfully dissent. The majority finds the conviction of Fernando Lancon is against the great weight and preponderance of the evidence. I believe that the weight of the eyewitness testimony, combined with the deference to be given to jury determinations of credibility, supports the conviction.

### TESTIMONY REGARDING EYEWITNESS IDENTIFICATION

The majority's opinion views all the evidence in a neutral light and then attempts to weigh the evidence, both pro and con, in accordance with *Watson*. Great weight is given to what the majority characterizes as the "objective" unreliability of Dominguez's and Diaz's eyewitness identification of Fernando Lancon as the shooter. Likewise, great weight is accorded to testimony identifying Eduardo as the shooter. Yet, the jury alone is the appropriate judge of the credibility and the weight to be given the witnesses' testimony and they must have found Dominguez's and Diaz's testimony more credible than the testimony of the defense witnesses.[1]

During cross-examination defense counsel extensively cross-examined witnesses

---

1. While the jury implicitly determined Fernando Lancon to be the shooter, they did not convict Zuniga as the driver. The jury was able to review all the evidence and reach a different conclusion as to these two defendants.

regarding the identification of Fernando as the shooter, pointing out inconsistencies and the unlikely conclusion that within twenty minutes after the shooting, Fernando changed cars, changed clothes, disposed of the murder weapon, dropped off Villarreal, washed his hands to remove the gunshot residue, and then came back to the scene of the shooting. Furthermore, defense counsel raised multiple inconsistencies regarding the testimony of the two eyewitnesses, including clothing descriptions provided by the two witnesses and evidence that the shooter was right-handed and that Fernando was left-handed. Moreover, as the majority points out, defense counsel even elicited admissions that both eyewitnesses had smoked marihuana on the day of the incident and the evening before trial. The jury sifted through the extensive testimony and seemed to find the evidence of Dominguez and Diaz more compelling than the other evidence. The jury's conclusion is supported by the evidence.

Dominguez testified that he knew both Eduardo and Fernando prior to the incident—he was in the sixth grade with Eduardo and saw Fernando daily at school. He conceded that Fernando and his brother looked alike, but that he was "one-hundred percent" sure that the individual shooting at him was Fernando Lancon. Diaz, on the other hand, acknowledged that he did not know Villarreal or Fernando prior to that evening, but identified both individuals in court as the individuals that exited the maroon car in front of the Soliz residence, and that he saw Fernando pointing a gun at Dominguez. When questioned about Fernando's physical resemblance to that of Eduardo, Diaz admitted that they looked alike and it was possible that he could be confused. Diaz, however, testified that he believed it was Fernando Lancon that exited the vehicle that night.

## CREDIBILITY DETERMINATIONS

Despite the lack of certitude, the evidence includes not only Dominguez's and Diaz's in-court identifications of Fernando, but also their descriptions of the shooter on the night in question and their photo line-up identifications. Some inaccuracies in a witness' description do not automatically render the evidence insufficient. *Bowden v. State*, 628 S.W.2d 782, 784 (Tex. Crim.App.1982); *see Escovedo v. State*, 902 S.W.2d 109, 115 (Tex.App.-Houston [1st Dist.] 1995, writ ref'd). Moreover, it is well established that a conviction may be based on the testimony of a single credible eyewitness. *Davis v. State*, 831 S.W.2d 839, 842 (Tex.App.-Dallas 1992, pet. ref'd) (holding that positive identification by victim was sufficient to sustain conviction, even though defendant offered five alibi witnesses that he was in another state at the time of the crime); *Harmon v. State*, 167 S.W.3d 610, 614 (Tex.App.-Houston [14th Dist.] 2005, pet. ref'd) (direct physical evidence is not necessary when the victim's testimony sufficiently supports conviction).

Furthermore, the majority relies on *Johnson v. State*, 23 S.W.3d 1, 9 (Tex. Crim.App.2000), that in certain instances credibility can be determined from a cold record. *Johnson*, however, is distinguishable from the current case because this shooting occurred in front of a house, the shooter was within three to ten feet from the witnesses, whose view was not obstructed, and Dominguez recognized Lancon as someone with whom he was already well acquainted. In its application of *Watson's* two prong test, the majority determines that the jury's implicit finding that Fernando, rather than Eduardo, was the shooter is greatly outweighed by the contrary evidence. *See Watson*, 204 S.W.3d at 414–15. The very basis of this determi-

nation rests on the credibility of the witnesses' testimony and fails to acknowledge that such determinations must remain solely within the purview of the jury. As the Court of Criminal Appeals stated:

> In reaching our conclusion in this case we have not overlooked the general rule, frequently announced, that the credibility of witnesses and the weight to be given their testimony exclusively rests with the jury and the lower court. Further, that this court will not pass on the sufficiency of the evidence unless there is an entire failure of proof. . . .

*Id.* at 411; *see also Swearingen v. State,* 101 S.W.3d 89, 97 (Tex.Crim.App.2003) (holding that appellate review defers to the fact-finder's determination of the credibility of the evidence); *Cain v. State,* 958 S.W.2d 404, 407 & nn. 4–5 (Tex.Crim.App. 1997).

### CONCLUSION

The jury heard all of the contrary evidence and obviously found Dominguez's and Diaz's testimony more credible than that of the opposing witnesses. The amount of weight to be given any particular testimony, or the amount any testimony should be discounted, must come from the jury alone and not from an appellate court. Moreover, I cannot agree the contrary evidence leads to an entire failure of proof and I am therefore unable to conclude that the evidence is so weak as to be clearly wrong and manifestly unjust.

Accordingly, I would affirm the judgment of the trial court.