*Court Of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*

★ ★ ★ ★ ★ ★

## MEMORANDUM OPINION

No. 04-05-00164-CR

Fernando **LANCON**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 49th Judicial District Court, Webb County, Texas
Trial Court No. 2004-CRN-000281-D1
Honorable Manuel R. Flores, Judge Presiding

Opinion by:         Steven C. Hilbig, Justice
Concurring opinion by:   Phylis J. Speedlin, Justice

Sitting:     Phylis J. Speedlin, Justice
            Rebecca Simmons, Justice
            Steven C. Hilbig, Justice

Delivered and Filed:   November 12, 2008

AFFIRMED

Fernando Lancon appeals his convictions for murder, attempted murder, and deadly conduct

after a jury trial.  We affirm the trial court's judgment.

### BACKGROUND

Lancon, along with co-defendants Alfonso Villarreal and Jorge Zuniga, were each charged

with murder, attempted murder, and deadly conduct resulting from a shooting which took place on

June 11, 2003.  After a joint jury trial, Zuniga was acquitted of all charges, but the remaining

defendants were found guilty on all charges. On appeal, this court held the evidence was factually insufficient to support the jury's verdicts against Lancon. *Lancon v. State*, 220 S.W.3d 57 (Tex. App.–San Antonio 2006), *vacated*, 253 S.W.3d 699 (Tex. Crim. App. 2008). The Texas Court of Criminal Appeals reversed, holding we incorrectly applied the standard of review because the evidence was contradictory and "largely based on a determination of the credibility of the witnesses," and we "failed to defer to the jury's verdict." *Lancon*, 253 S.W.3d at 707. The court remanded the appeal to this court "to conduct a factual sufficiency review in accordance with [its] opinion." *Id.*

### THE EVIDENCE

The evidence presented at trial was exhaustively set forth in the previous opinions. Because the court of criminal appeals' opinion accurately summarizes the facts, we quote from its opinion[1]:

> On June 11, 2003, Appellant's co-defendant, Alfonso Villareal, was at his neighborhood recreation center. Another boy, Hector Dominguez, was also visiting the rec center with his friend, Daniel Diaz. While at the rec center, Dominguez started a verbal altercation with Villareal. When the argument was over, Villareal made a phone call and was soon picked up in a maroon car. Shortly thereafter, Dominguez and Diaz left the rec center and began walking to Freddie Soliz's house, which was approximately one block away. When Dominguez and Diaz arrived at the Soliz house, Freddie Soliz came out to the sidewalk in front of the house to talk to the two boys. A maroon or purple car with three people inside stopped in front of the Soliz house, and Villareal got out of the car to fight Dominguez. A second person, holding a gun, also got out of the car. This second individual fired two shots in the direction of Dominguez, Diaz, and Soliz, who were standing in front of the Soliz house. When the shooting started, Dominguez ran toward the back of the house, while Soliz and Diaz stayed in the front yard. After firing two shots, the shooter jumped back into the car, as did Villareal, and the car sped away. This entire incident lasted for less than one minute. While neither of the shots hit the three boys in the front yard, one bullet went through the wall of the Soliz residence and hit and killed eleven-month-old Federico Soliz III.

> The first 911 call the police received was made at 9:20 p.m. When the Detectives arrived at the scene at 9:30 p.m., they asked Dominguez who had shot at

---

[1] Although documents in the clerk's record establish that Alfonso Villarreal's name is spelled with two "r"s, the court of criminal appeals spelled the name "Villareal" throughout its opinion. We will accurately quote the opinion; however, in our discussion, we use the correct spelling.

him, and Dominguez told them that the shooter was Appellant, a cousin of Villareal. A second 911 call was received at 9:26 p.m., in which the caller said that the suspects might be at 1418 Kearney Street, the address at which Appellant lived with his grandmother. Officers were sent to the address, but they did not find Appellant or the maroon vehicle. While officers were at the scene of the shooting, Dominguez saw Appellant drive by in a white Cadillac and informed the officers. Roughly four minutes after that, Investigator Rodriguez noticed that the white Cadillac had stopped in the street about a half a block away from the scene. Police approached the Cadillac and detained Appellant and Jorge Zuniga. Detective Cantu administered gunshot-residue tests on both Appellant and Zuniga and took the clothing that they were wearing.

Dominguez and Diaz gave videotaped statements to the police. They were also shown photo lineups and asked if Appellant was in the lineup. Both identified Appellant correctly. Soliz also told police that Appellant was the shooter, but did not identify him in a lineup. Police were never able to locate the maroon vehicle, nor did they recover the weapon that was used in the shooting. Although Zuniga's gunshot-residue came back positive, Appellant's gunshot-residue test came back negative, so there was no physical evidence linking Appellant to the crime.

The rest of the facts surrounding the case are contested, as Appellant claimed that his younger brother, Eduardo, committed the crime. At trial, both Dominguez and Diaz testified, as did three girls who were witnesses to the shooting and several police officers and detectives. Dominguez testified that Villareal exited the maroon vehicle and asked him if he wanted to fight, and when Appellant got out of the car, Villareal ordered Appellant to shoot. Although Dominguez ran either when the gun was cocked or when the shooting began, he testified that he saw Appellant shoot the gun. He also stated that he was shown three lineups on the night of the shooting. At first Dominguez testified that he did not recognize anyone, but he later stated that he identified Appellant. When Dominguez was asked about the appearance of the shooter, he first said that he didn't remember what the shooter was wearing, but moments later he said that Appellant had been wearing a white shirt, blue shorts, and a blue New York Yankees cap and had held the gun in his right hand. Dominguez also admitted that he smoked marijuana almost every day, including the day of the shooting. However, Dominguez testified that he was 100% sure that Appellant was the shooter and not his brother, Eduardo, whom Dominguez also knew.

Daniel Diaz testified that he knew Appellant because he had seen him before, but that he did not know Villareal prior to the shooting. Diaz also said that he did not see who was driving the vehicle and that he identified Appellant and Villareal from lineups. The day after the shooting, Diaz identified Zuniga as the driver. Diaz testified that the shooter was wearing a white shirt and pants, but no baseball cap. He also admitted on the stand that, while he could not be positive that he smoked marijuana the day of the shooting, it was possible because he often smoked marijuana.

Kimberly Sanchez, a girl who was also at the rec center on the day of the shooting, testified that she witnessed the argument between Dominguez and Villareal. She said that, after the argument, she saw Villareal make a phone call and heard him ask for "Moiky," Appellant's nickname. Sanchez testified that she did not know who Moiky was or if Villareal even spoke to him on the phone. She had left the rec center with her friends, Monica and Melissa Soliz, and had started walking to their house when she saw the maroon car stop in front of the Soliz house and saw someone in a white shirt get out of the car. Sanchez testified that when they heard the gunshots, she and her friends ran back to the rec center.

The police officers and detectives testified about their investigation of the case, including their arrival at the scene and the lineups shown to Dominguez and Diaz. Detective Cantu testified that his theory of what happened in the 14 minutes between the first 911 call and Appellant and Zuniga driving by in the Cadillac was that the three men drove away from the shooting, Appellant dropped Villareal off, Appellant and Zuniga disposed of the car and their clothing, Appellant washed his hands, and then Appellant and Zuniga got in Appellant's white Cadillac to return to the scene. Detective Cantu admitted that he had no evidence to prove his theory. Detective Cantu also testified about a search warrant that was executed at the home of Lydia Fernandez, an aunt of Villareal and Appellant. Several people were arrested at Fernandez's home and weapons were seized, although none matched the murder weapon.

All three defendants, including Appellant, testified at trial. Appellant and Zuniga testified about the events leading up to their detention and said that they were together on that evening but that neither of them had been with Villareal or involved in the shooting. Appellant also testified that he and his brother, Eduardo, had been raised in separate households, and he demonstrated that he was left-handed by signing his name in front of the jury. Villareal testified that Eduardo was the shooter, but that he did not know that Eduardo had a gun and he did not order Eduardo to shoot at Dominguez and Diaz. Villareal admitted that he fled to Mexico following the shooting.

Additionally, several family members of Appellant and Villareal testified, including Jose Gonzalez, the cousin of Appellant, Eduardo, and Villareal, who testified that he was the driver and Eduardo was the shooter. Gonzalez stated that he was told by his Aunt Lydia to pick Villareal up at the rec center because Villareal was getting beaten up and Eduardo came along. Gonzalez said that, after he and Eduardo picked up Villareal, they were driving back home when Eduardo and Villareal jumped out of the car, argued with some boys on the street, and then Eduardo started shooting. Gonzalez testified that he did not know that Eduardo had a gun and that after the shooting he dropped both Eduardo and Villareal off at his aunt's house. He also said that he had not talked to Eduardo since that evening and thought that the police would arrest Eduardo because he heard that they were looking for Villareal.

Gonzalez's mother, Ava Maria Gonzalez, testified that she owned the maroon car and that her son had driven it on June 11. Mrs. Gonzalez admitted that when she was questioned by the police, she told them that her son had arrived home at 7:45 p.m. and had never left the house after that.

Several aunts of Appellant and Eduardo testified that on the day of the shooting and in the days after, they heard Eduardo confess that he had been the shooter, but that he thought he had shot one of the boys in front of the house. One aunt even told the police that she believed that Eduardo had wrapped the gun in a towel and hidden it, which resulted in the subsequent search of Lydia Fernandez's home. Villareal's mother, Yolanda, testified that she also heard Eduardo admit to the shooting on two separate occasions, and she gave Detective Cantu a statement about this five days after the shooting.

*Lancon*, 253 S.W.3d at 701-704.

## DISCUSSION

When we review the evidence for factual sufficiency, we look at the evidence in a neutral light giving almost complete deference to the jury's determinations of credibility. *Lancon*, 253 S.W.3d at 705. We reverse only if the evidence supporting the verdict is so weak that the verdict seems clearly wrong and manifestly unjust or if the evidence supporting the verdict is outweighed by the great weight and preponderance of the evidence. *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006).

Two eyewitnesses – Dominguez and Diaz – testified Lancon was the person who fired shots at them. Although Diaz admitted during cross-examination it was possible he could have mistaken Eduardo Lancon for the appellant, he also testified that he "knew how [Fernando] looked" and did not think he made a mistake in his identification. Dominguez testified he was "one-hundred percent sure" appellant was the person who shot at him, he knew appellant's brother Eduardo, and it was not Eduardo who shot at them. As discussed in the prior opinions in this case, Diaz and Dominguez probably used marijuana the day of the shooting and there were a number of conflicts and inconsistencies between their testimony, and even within their own testimony, as to some details.

However, other parts of their testimony were consistent and demonstrated an ability to recall details of the incident. Both witnesses testified they knew Lancon before this incident, thus lessening the chance of a misidentification. Both Diaz and Dominguez identified the weapon used as an automatic pistol, and the evidence indicates the weapon was likely an automatic. Both witnesses also testified the pistol was black in color. The jury could have rationally chosen to believe the eyewitnesses' identification of appellant.

The defense presented evidence Eduardo Lancon was the person who fired the gun and argued the eyewitnesses were mistaken as to their identification. But there were inconsistencies in the defense evidence as well. Jose Gonzalez testified he drove the maroon car the night of the shooting and Eduardo Lancon fired the shots. However, Gonzalez's mother, Ana Maria Gonzalez, admitted during cross-examination she previously told authorities that on the night of the shooting Jose Gonzalez came home around 7:45 p.m. and did not leave the home for the remainder of the evening. Villarreal testified that when he called his aunt's house for a ride from the recreation center, he did not ask for anyone in particular. Yet Kimberly Sanchez, who was thirteen years old and had no apparent motive to fabricate, testified she heard Villarreal ask for "Moiky" – Fernando Lancon's nickname.

The evidence in this case was conflicting and hotly contested. The State presented two eyewitnesses who testified Lancon was the shooter. Lancon sharply cross-examined the eyewitnesses and exposed inconsistencies in their testimony and in other parts of the State's evidence. He presented plausible testimony that a different person was responsible for the crime, but there were also inconsistencies in the theory that Eduardo Lancon was the shooter. Given the inconsistencies apparent in both theories, the resolution of the conflicts rested on the credibility of the witnesses and was the province of the jury. The jury, after hearing all the evidence, rejected

Lancon's proffered defense.  We cannot conclude the evidence supporting the verdict is so weak that the verdict seems clearly wrong and manifestly unjust or is outweighed by the great weight and preponderance of the evidence.

The trial court's judgment is affirmed.


Steven C. Hilbig, Justice

Publish