

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. 0182-07

**FERNANDO LANCON, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FOURTH COURT OF APPEALS
### WEBB COUNTY

MEYERS, J., delivered the opinion of the Court, in which KELLER, P.J., KEASLER, HERVEY, and COCHRAN, JJ., joined. JOHNSON, J., filed a dissenting opinion, in which PRICE and HOLCOMB, JJ., joined. WOMACK, J., dissented.

## O P I N I O N

Appellant, Fernando Lancon, stood trial with two co-defendants, Alfonoso Villareal and Jorge Zuniga. Appellant was convicted of one count each for murder, attempted murder, and deadly conduct. The jury assessed punishment at twenty-five years', fifteen years', and ten years' confinement, respectively. Villareal was also found

guilty, but Zuniga was acquitted. Appellant appealed the convictions based on factual insufficiency of the evidence to sustain his convictions, the failure of the prosecutor to disclose exculpatory evidence, and the improper admission of two photographs into evidence. The court of appeals held that it was not an abuse of discretion to admit the two photographs into evidence, and that Appellant failed to establish that it was reasonably probable that the outcome of the trial would have been different had the prosecutor made a timely disclosure of the alleged exculpatory evidence. *Lancon v. State*, 220 S.W.3d 57 (Tex. App. – San Antonio, 2006)(mem. op.). The court of appeals also held that the evidence was factually insufficient to support the convictions and remanded the case for a new trial. The State filed a petition for discretionary review, which we granted to consider whether the court of appeals correctly applied the factual-sufficiency standard of review. We determine that the standard was not correctly applied. We vacate the judgment of the court of appeals and remand the case for the court of appeals to consider the sufficiency of the evidence under the standard set forth in *Watson v. State*, 204 S.W.3d 404 (Tex. Crim. App. 2006).

**FACTS**

We first lay out the undisputed facts of this case. On June 11, 2003, Appellant's co-defendant, Alfonso Villareal, was at his neighborhood recreation center. Another boy, Hector Dominguez, was also visiting the rec center with his friend, Daniel Diaz. While at the rec center, Dominguez started a verbal altercation with Villareal. When the argument

was over, Villareal made a phone call and was soon picked up in a maroon car. Shortly thereafter, Dominguez and Diaz left the rec center and began walking to Freddie Soliz's house, which was approximately one block away. When Dominguez and Diaz arrived at the Soliz house, Freddie Soliz came out to the sidewalk in front of the house to talk to the two boys. A maroon or purple car with three people inside stopped in front of the Soliz house, and Villareal got out of the car to fight Dominguez. A second person, holding a gun, also got out of the car. This second individual fired two shots in the direction of Dominguez, Diaz, and Soliz, who were standing in front of the Soliz house. When the shooting started, Dominguez ran toward the back of the house, while Soliz and Diaz stayed in the front yard. After firing two shots, the shooter jumped back into the car, as did Villareal, and the car sped away. This entire incident lasted for less than one minute. While neither of the shots hit the three boys in the front yard, one bullet went through the wall of the Soliz residence and hit and killed eleven-month-old Federico Soliz III.

The first 911 call the police received was made at 9:20 p.m. When the Detectives arrived at the scene at 9:30 p.m., they asked Dominguez who had shot at him, and Dominguez told them that the shooter was Appellant, a cousin of Villareal. A second 911 call was received at 9:26 p.m., in which the caller said that the suspects might be at 1418 Kearney Street, the address at which Appellant lived with his grandmother. Officers were sent to the address, but they did not find Appellant or the maroon vehicle. While officers were at the scene of the shooting, Dominguez saw Appellant drive by in a white Cadillac

and informed the officers. Roughly four minutes after that, Investigator Rodriguez noticed that the white Cadillac had stopped in the street about a half a block away from the scene. Police approached the Cadillac and detained Appellant and Jorge Zuniga. Detective Cantu administered gunshot-residue tests on both Appellant and Zuniga and took the clothing that they were wearing.

Dominguez and Diaz gave videotaped statements to the police. They were also shown photo lineups and asked if Appellant was in the lineup. Both identified Appellant correctly. Soliz also told police that Appellant was the shooter, but did not identify him in a lineup. Police were never able to locate the maroon vehicle, nor did they recover the weapon that was used in the shooting. Although Zuniga's gunshot-residue came back positive, Appellant's gunshot-residue test came back negative, so there was no physical evidence linking Appellant to the crime.

The rest of the facts surrounding the case are contested, as Appellant claimed that his younger brother, Eduardo, committed the crime. At trial, both Dominguez and Diaz testified, as did three girls who were witnesses to the shooting and several police officers and detectives. Dominguez testified that Villareal exited the maroon vehicle and asked him if he wanted to fight, and when Appellant got out of the car, Villareal ordered Appellant to shoot. Although Dominguez ran either when the gun was cocked or when the shooting began, he testified that he saw Appellant shoot the gun. He also stated that he was shown three lineups on the night of the shooting. At first Dominguez testified that

he did not recognize anyone, but he later stated that he identified Appellant. When Dominguez was asked about the appearance of the shooter, he first said that he didn't remember what the shooter was wearing, but moments later he said that Appellant had been wearing a white shirt, blue shorts, and a blue New York Yankees cap and had held the gun in his right hand. Dominguez also admitted that he smoked marijuana almost every day, including the day of the shooting. However, Dominguez testified that he was 100% sure that Appellant was the shooter and not his brother, Eduardo, whom Dominguez also knew.

Daniel Diaz testified that he knew Appellant because he had seen him before, but that he did not know Villareal prior to the shooting. Diaz also said that he did not see who was driving the vehicle and that he identified Appellant and Villareal from lineups. The day after the shooting, Diaz identified Zuniga as the driver. Diaz testified that the shooter was wearing a white shirt and pants, but no baseball cap. He also admitted on the stand that, while he could not be positive that he smoked marijuana the day of the shooting, it was possible because he often smoked marijuana.

Kimberly Sanchez, a girl who was also at the rec center on the day of the shooting, testified that she witnessed the argument between Dominguez and Villareal. She said that, after the argument, she saw Villareal make a phone call and heard him ask for "Moiky," Appellant's nickname. Sanchez testified that she did not know who Moiky was or if Villareal even spoke to him on the phone. She had left the rec center with her

friends, Monica and Melissa Soliz, and had started walking to their house when she saw the maroon car stop in front of the Soliz house and saw someone in a white shirt get out of the car. Sanchez testified that when they heard the gunshots, she and her friends ran back to the rec center.

The police officers and detectives testified about their investigation of the case, including their arrival at the scene and the lineups shown to Dominguez and Diaz. Detective Cantu testified that his theory of what happened in the 14 minutes between the first 911 call and Appellant and Zuniga driving by in the Cadillac was that the three men drove away from the shooting, Appellant dropped Villareal off, Appellant and Zuniga disposed of the car and their clothing, Appellant washed his hands, and then Appellant and Zuniga got in Appellant's white Cadillac to return to the scene. Detective Cantu admitted that he had no evidence to prove his theory. Detective Cantu also testified about a search warrant that was executed at the home of Lydia Fernandez, an aunt of Villareal and Appellant. Several people were arrested at Fernandez's home and weapons were seized, although none matched the murder weapon.

All three defendants, including Appellant, testified at trial. Appellant and Zuniga testified about the events leading up to their detention and said that they were together on that evening but that neither of them had been with Villareal or involved in the shooting. Appellant also testified that he and his brother, Eduardo, had been raised in separate households, and he demonstrated that he was left-handed by signing his name in front of

the jury. Villareal testified that Eduardo was the shooter, but that he did not know that Eduardo had a gun and he did not order Eduardo to shoot at Dominguez and Diaz. Villareal admitted that he fled to Mexico following the shooting.

Additionally, several family members of Appellant and Villareal testified, including Jose Gonzalez, the cousin of Appellant, Eduardo, and Villareal, who testified that he was the driver and Eduardo was the shooter. Gonzalez stated that he was told by his Aunt Lydia to pick Villareal up at the rec center because Villareal was getting beaten up and Eduardo came along. Gonzalez said that, after he and Eduardo picked up Villareal, they were driving back home when Eduardo and Villareal jumped out of the car, argued with some boys on the street, and then Eduardo started shooting. Gonzalez testified that he did not know that Eduardo had a gun and that after the shooting he dropped both Eduardo and Villareal off at his aunt's house. He also said that he had not talked to Eduardo since that evening and thought that the police would arrest Eduardo because he heard that they were looking for Villareal.

Gonzalez's mother, Ava Maria Gonzalez, testified that she owned the maroon car and that her son had driven it on June 11. Mrs. Gonzalez admitted that when she was questioned by the police, she told them that her son had arrived home at 7:45 p.m. and had never left the house after that.

Several aunts of Appellant and Eduardo testified that on the day of the shooting and in the days after, they heard Eduardo confess that he had been the shooter, but that he

thought he had shot one of the boys in front of the house. One aunt even told the police that she believed that Eduardo had wrapped the gun in a towel and hidden it, which resulted in the subsequent search of Lydia Fernandez's home. Villareal's mother, Yolanda, testified that she also heard Eduardo admit to the shooting on two separate occasions, and she gave Detective Cantu a statement about this five days after the shooting.

## COURT OF APPEALS DECISION

On appeal, Appellant argued that the evidence to support his conviction was factually insufficient, that the prosecutor failed to disclose exculpatory evidence, and that the trial judge abused his discretion by admitting two photographs into evidence. The court of appeals determined that the evidence was factually insufficient to support Appellant's convictions. The court also held that Appellant failed to show that it was reasonably probable that the trial outcome would have been different had the exculpatory evidence been properly disclosed, and that it was not an abuse of discretion to admit the photographs into evidence.

In addressing its decision that the evidence was factually insufficient, the court laid out, verbatim, the standard of review discussed in *Watson*. The court then stated that its decision was based on the "objective unreliability of Dominguez's and Diaz's testimony that Fernando Lancon was the shooter coupled with the weight and quantity of the evidence that the shooter was not Fernando but Eduardo Lancon." *Lancon v. State*, 220

S.W.3d 57, 67 (Tex. App. – San Antonio, 2006)(mem. op.). The court detailed the discrepancies in Dominguez's and Diaz's testimony and explained that their conflicting testimony, coupled with the unvarying testimony of Appellant's defense witnesses, led them to find that vacating Appellant's conviction and remanding the cause for a new trial was "necessary to arrest the occurrence of a manifest injustice." *Id.* at 68, *quoting Johnson v. State*, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000).

## ANALYSIS

**Factual Sufficiency Review, Generally**

The Factual Conclusivity Clause of the Texas Constitution states that "[courts of appeals] shall be conclusive on all questions of fact brought before them on appeal or error." TEX. CONST. art. V, §6. We have previously determined that this means that we are not permitted to conduct a *de novo* review of a court of appeals' factual sufficiency determination. *Cain v. State*, 958 S.W.2d 404, 408 (Tex. Crim. App. 1997). However, the decision of the court of appeals is not completely unreviewable, as the question of whether the court of appeals applied the correct rule of law is a legal question. *Id.* Therefore, our review is centered upon whether the court of appeals applied the correct standard of review and considered all of the relevant evidence. We cannot simply do our own factual-sufficiency analysis, we can review only whether the court of appeals misapplied the standard of review. *Zuniga v. State*, 144 S.W.3d 477, 482 (Tex. Crim. App. 2004). In deciding whether the court of appeals applied the correct standard of

review when it's reversed for factual-insufficiency, this Court must also examine whether the court of appeals carried out the judicially-imposed requirements for safeguarding a defendant's right to trial by jury. These safeguards include deference to the jury's verdict and an examination of all of the evidence. *Roberts v. State*, 221 S.W.3d 659 (Tex. Crim. App. 2007).

There are three basic ground rules that guide a court of appeals in conducting a factual-sufficiency analysis. First, the court of appeals must be cognizant of the fact that a jury has already passed on the facts and must give due deference to the determinations of the jury. While the court of appeals may disagree with the factfinder, it should afford the appropriate deference in order to avoid substituting its judgment for that of the jury. *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996). Second, the court of appeals' opinion should clearly lay out and explain how the evidence supporting the verdict is too weak on its own, or state how the contradicting evidence greatly outweighs evidence in support of the verdict. This is particularly important because it assists this Court in determining whether the court of appeals applied the standard of review properly. Third, the appellate court should review all of the evidence in a neutral light, as opposed to a legal-sufficiency review in which the evidence is viewed in the light most favorable to the verdict. *Watson v. State*, 204 S.W.3d 404, 415 (Tex. Crim. App. 2006). A verdict should be set aside only if the evidence supporting the verdict is so weak as to render the verdict clearly wrong or manifestly unjust. *Cain,* 958 S.W.2d at 406.

**Review of the Court of Appeals' Decision**

As we explained in *Goodman v. State*, 66 S.W.3d 283 (Tex. Crim. App. 2001), there are two ways in which the evidence may be insufficient. The first is that the evidence supporting the verdict, though legally sufficient, is nonetheless too weak to support it. The second is that, when considering conflicting evidence, the jury's verdict is against the great weight and preponderance of the evidence. In this case, the court of appeals vacated the conviction and remanded the cause for a new trial based upon the conflicting evidence.

To support this conclusion, the court of appeals accurately stated the standard of review and addressed all of the evidence. The court of appeals included a detailed description of the undisputed facts, as well as the evidence supporting and contrary to the conviction. *Lancon,* 220 S.W.3d at 59-67. However, the court of appeals failed to adhere to the three factual-sufficiency ground rules described above.

The majority of the evidence that the court of appeals points to is contradictory witness testimony, and although the evidence is compelling, the jury is the sole judge of what weight to give such testimony. *See* TEX. CRIM. PROC. CODE ANN. art. 36.13 and 38.04 (stating that the jury is the exclusive judge of the facts and of the weight given to testimony). Appellate courts should afford almost complete deference to a jury's decision when that decision is based upon an evaluation of credibility. The jury is in the best position to judge the credibility of a witness because it is present to hear the testimony, as

opposed to an appellate court who relies on the cold record. *See Marshall v. State*, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006).

The court of appeals determined that Dominguez's and Diaz's testimony was "objectively unreliable," and concluded that it was not unreasonable to distrust their eyewitness testimony given the circumstances surrounding the shooting. There were many inconsistencies within Dominguez's and Diaz's testimony, as well as inconsistencies between their testimony. Dominguez contradicted himself several times. He testified that he did not remember what Appellant was wearing, and then moments later gave a description of the clothing. Dominguez also had trouble describing his actions when the shooting started, saying that he started running when the gun was cocked, while still maintaining that he saw Appellant actually pull the trigger when he was running toward the back of the house with his back turned. The descriptions given by Dominguez and Diaz were also inconsistent, with Dominguez declaring that he remembered Appellant wearing a baseball cap and Diaz testifying that the shooter was not wearing a baseball cap. In addition, Kimberly Sanchez did not include a baseball cap in her description of the shooter. Both Dominguez and Diaz admitted to smoking marijuana often, Dominguez even testified that he had smoked marijuana on the day of the shooting. And Diaz admitted on cross-examination that he might have mistaken Appellant for his brother, Eduardo. As part of the evidence contrary to the verdict, the court of appeals explained that the testimony of the defense witnesses was consistent, and that two of the

witnesses admitted their own complicity in the crime. However, the court of appeals seems to have failed to consider evidence that supported the jury's verdict. One example of this is Detective Cantu's testimony that Dominguez said Appellant was the shooter mere minutes after the shooting.[1] As a matter of law, evidence of this sort is considered especially trustworthy given the surrounding circumstances. *See Rabbani v. State,* 847 S.W.2d 555, 560 (Tex. Crim. App. 1992)(explaining that present sense impression statements are considered exceptionally reliable because they are safe from error of memory and there is little or no time for a calculated misstatement, therefore, they are excluded from the hearsay rule).

---

[1]The following is Detective Cantu's testimony regarding his arrival on the scene:

[The State]: Okay. And what happened–what were your observations when you got there to the house?

[Cantu]: The three individuals that were there, one was Hector Dominguez, Fernando Soliz, and Daniel Diaz. Daniel Diaz, I want to say was in shock. He was just standing there. Fernando Soliz was screaming that the baby–the baby was shot. He was shot. I tried to calm him down. Hector Diaz [sic] was excited, you know. He was–I couldn't understand. They were all talking at the same time.

[The State]: Did you ask him at any–did you ask him any questions?

[Cantu]: I asked him what happened and he said that he got shot at, and then said–I told him–

* * *

[Cantu]: I told him, Who did this to you? Who shot? And he said Fernando Lancon.

* * *

[The State]: When you showed lineups to the witnesses how was Fernando Lancon identified?

[Cantu]: He was identified–Hector Dominguez knew Fernando Lancon. Okay. He already knew who he was, and–

* * *

[Cantu]: So he knew who was at the scene, and he mentioned at the time when I arrived that Fernando Lancon was the one who shot at him.

As we said before, there was no physical evidence linking Appellant to the crime, and the State's evidence boiled down to the testimony of the witnesses and police officers. The evidence presented by the defense also consisted of testimony, including Appellant, his family members, and his co-defendant. All of this was presented to the jury and the jury is to decide upon the credibility of the testimony. As we explained in *State v. Johnson*, 23 S.W.3d 1 (Tex. Crim. App. 2000), an appellate court must give deference to a jury's decision regarding what weight to give contradictory testimonial evidence because the decision is most likely based on an evaluation of credibility and demeanor, which the jury is in the better position to judge.

Under *Watson*, we further explained that there must be an objective basis in the record in order to say that the great weight and preponderance of the evidence contradicts the jury's verdict. 204 S.W.3d at 417. The court of appeals tries to satisfy this requirement with the proclamation that Dominguez's and Diaz's testimony is unreliable. But it is as equally plausible that Dominguez and Diaz were telling the truth as it is they were lying when they testified. It is for the jury to determine if they believe that Dominguez and Diaz are lying or telling the truth. None of the testimony at trial definitively favors or contradicts the jury's verdict, it all bears on credibility. Because the jury is the sole judge of a witness's credibility, and the weight to be given the testimony, it may choose to believe some testimony and disbelieve other testimony. *See Margraves v. State*, 34 S.W.3d 912, 919 (Tex Crim. App. 2000). A decision is not manifestly unjust

solely because the court of appeals would have resolved the conflicting evidence in a different way. *Watson*, at 417.

## CONCLUSION

The court of appeals correctly stated the standard set forth in *Watson*, but incorrectly applied the standard in conducting the factual-sufficiency review. Because the evidence in the case was largely based on a determination of the credibility of the witnesses, and the court of appeals' factual-sufficiency review failed to defer to the jury's verdict, we vacate the decision of the court of appeals and remand this cause for the court to conduct a factual sufficiency review in accordance with this opinion.

Meyers, J.

Delivered: May 14, 2008

Publish