

NUMBER 13-04-00494-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

LEE ANN YVETTE HERNANDEZ GARZA,                          Appellant,

v.

THE STATE OF TEXAS,                                      Appellee.

**On appeal from the 275th District Court
of Hidalgo County, Texas.**

# O P I N I O N

**Before Chief Justice Valdez and Justices Garza and Vela
Opinion by Chief Justice Valdez**

A jury found appellant, Lee Ann Yvette Hernandez Garza, guilty of attempted murder, a second degree felony. *See* TEX. PENAL CODE ANN. §§ 15.01, 19.02(b)(1) (Vernon 2003). The jury assessed punishment at twenty years' confinement and a $10,000 fine. In what we construe as two issues presented for our review, Garza contends

that the evidence is legally and factually insufficient to support her conviction.  We affirm.

## I. GARZA'S BRIEF

As a threshold matter, we must address various deficiencies in Garza's appellate brief that the State has called to our attention.  By the issues presented section of her brief, Garza purports to raise eleven issues for our review.  *See* TEX. R. APP. P. 38.1(f).  Issues four through nine of that section are titled "Insufficient time allocated or provided to so [sic] this work," and they are never mentioned again in what may be considered the argument section of the brief.  *See id*. Rule 38.1(i).  Accordingly, these "issues" present nothing for our review.

Issues one through three are stated as follows:

(1)     Whether the trial court authorized the jury to non-unanimous [sic] find guilt?

(2)     Whether the trial court unconstitutionally amended the grand jury's indictment by authorizing the jury to convict under paragraph 2B of the court's charge?

(3)     Whether the State obtained this party's law conviction unconstitutionally by arguing under court's charge paragraph 2B for jury's non-unanimous finding of appellant's beginning any of six overt acts after Wally Salazar completed charged attempted murder?

Unlike issues four through nine, these "issues" make assertions and appear as phrases in the argument section.  Nevertheless, the State posits that the first three issues do not present any argument or authority in support of their assertions and are inadequately briefed.  *See id*. ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record.").  We agree and conclude that the issues are waived.

2

In her tenth and eleventh issues, Garza contends that the evidence is legally and factually insufficient because there is insufficient evidence that she is guilty of the offense under the law of parties. In advancing these final two issues, Garza does not make a single record reference. *Id*. The statement of facts section, which contains some record references, consists entirely of (1) large portions of the trial attorneys' closing arguments to the jury, and (2) the testimony of Pedro Vela, one of the fourteen witnesses who testified. In submitting Garza's most recent brief, her retained appellate counsel noted that he was submitting an "Amended Initial Appellant's Brief" and that "[h]opefully, this Appellant's such final brief will soon be filed with the clerk of this busy court of appeals."

To the extent Garza's appellate counsel requests leave from this Court to amend or supplement the brief, such request is hereby denied. Garza's notice of appeal was filed on August 10, 2004. Since that date, Garza's appellate counsel has been granted four extensions of time, and this case has been abated twice. The first abatement was made to determine the status of missing portions of the reporter's record. *See id*. RULE 38.3(a)(2). The second abatement was made because no appellate brief was filed, and this Court directed the trial court to conduct a hearing to determine, *inter alia*, if Garza was indigent and wished to prosecute her appeal. *See id*. Rule 38.8(b)(2) & (3). The trial court found Garza indigent[1] and recommended to this Court that her brief be due on June 29, 2007. On July 2, 2007, nearly three years after the notice of appeal was filed, Garza's appellate counsel submitted a brief that this Court struck because it failed to comply with then-subsections (b), (c), (d), (e) and (g) of Rule 38.1 of the Texas Rules of Appellate

---

[1] Although the trial court found Garza indigent, her father retained and paid for an appellate attorney that she requested, *see infra*.

Procedure.[2] This Court ordered that Garza's new brief be filed on August 31, 2007. On September 4, 2007, Garza's appellate counsel tendered the brief that is currently before us.

Given Garza's appellate counsel's persistent dereliction, we submit this case on Garza's most recent and tardy brief[3] and the State's brief in order not to delay the submission of this case any longer. *See id.* Rule 38.8(b)(1) (providing that an appellant's failure to timely file a brief does not authorize either dismissal of the appeal or consideration of the appeal without brief except under limited circumstances). Our decision to submit the instant briefs is made in light of Garza's constitutional right to proceed with the attorney of her choosing. *See Powell v. Alabama*, 287 U.S. 45, 53 (1932) (providing that a defendant should be afforded fair opportunity to secure counsel of his own choice). On September 8, 2004, Garza filed a holographic motion stating that she wished to substitute as her attorney on appeal an appellate attorney that her father retained, and that attorney has represented her ever since. We conclude that Garza's right to choice of retained counsel extends to an appellate attorney.

However, out of an abundance of caution and in order to ensure that Garza's rights are protected, we will consider Garza's two remaining issues. *See* TEX. R. APP. P. 38.8(b)(4) (providing that based on a Rule 38.8(b)(3) hearing record, an "appellate court may act appropriately to ensure that the appellant's rights are protected. . . ."). In some

___

[2] On September 30, 2008, the Texas Court of Criminal Appeals approved amendments to appellate rules that affect criminal appeals. *See Amendments to the Rules of Appellate Procedure*, Misc. Docket No. 08-103 (Tex. Crim. App., Sep. 30, 2008). Consequently, the subsections of Rule 38.1 were slightly reordered. TEX. R. APP. P. 38.1. At the time Garza's first brief was struck, it omitted the following: a table of contents, an index of authorities, a statement of the case, the issues presented, and a summary of the argument. *See id.*

[3] Accordingly, the Clerk of this Court is ordered to designate Garza's September 4, 2007 brief as filed.

appeals where the briefing is apparently adequate, the court of criminal appeals has found it helpful to quote large portions of the State's brief to convey the factual background of a case. *See, e.g., Klein v. State*, 273 S.W.3d 297, 302 n.2 (Tex. Crim. App. 2008). Accordingly, we will recount the evidence and review its sufficiency with the guidance of the State's brief and our own review of the record. *See* TEX. R. APP. P. 38.9(b).

## II. SUFFICIENCY OF THE EVIDENCE

In what we construe as her two issues, Garza contends that the evidence is legally and factually insufficient to support her conviction.

## A. Factual Background

On October 15, 2003, M.C., a seventeen-year-old girl, was beaten, strangled, stabbed, wrapped in a tarp, and left in a ditch to die by Guadalupe "Wally" Salazar and Garza. The motive for the incident was a love triangle that turned violent. The following individuals, *inter alia*, testified for the State at trial as to the attack: (1) M.C., (2) Salazar, and (3) Pedro Vela,[4] a witness to portions of the incident.

The State summarized M.C.'s testimony as the following, which is provided without record citations:

> [M.C.] testified that she has known [Garza] for about five years and the two of them had been best friends for two-and-a-half years before October 15, 2003; that Wally Salazar had been [Garza's] boyfriend at that time; that she had been dating Oscar Olivarez, Wally's cousin; that [Garza] and Wally had broken up in the fall of 2003; that she and Wally would talk as friends for about two weeks before October 15, 2003; and that they had kissed, but nothing more. [M.C.] also indicated that [Garza] had known that she was seeing Wally; that [Garza] had once waited for her and Wally to

---

[4] Before trial, Salazar pleaded guilty to attempted murder and received a ten-year sentence. Vela, who was sixteen years old at trial, also pleaded guilty to attempted murder and received a ten-year probated determinate sentence.

5

return to her house, gone over to Wally's truck, tried to kiss Wally, gotten pushed away, slapped Wally on the forehead, and had the truck door closed on her; that she and [Garza] had left together after this incident; and that [Garza] had not been mad at her and had said that she was seeing her brother's friend Roy.

[M.C.] next stated that [Garza] had asked her if anything had happened after she and Wally had stopped talking; that she had replied that they had kissed, but that it had not meant anything; that [Garza] had said that that was fine; and that she and Wally had stopped talking after seven days because [Garza] had told Wally that she was pregnant. [M.C.] also said that she and Oscar Olivarez had gotten back together three days before October 15th; that she had gotten into an argument with her father about her boyfriend on October 14th and had left with some friends, gone to Roy's house and started drinking and using cocaine; that [Garza] was always talking about wanting to kiss somebody; that she had a feeling that [Garza] was still upset about Wally; and that she had told her mother that [Garza] was probably going to kill her.

[M.C.] then said that she had asked a friend to take her to Oscar's house at about 2:30 a.m. on October 15th; that Oscar had left for Austin the next morning; that Wally and [Vela] had gone by and honked; that she had then called Wally so see if he was okay; and that Wally had told her that he would send more friends to pick her up. She also noted that [two other male friends and Vela] had already been waiting for her when she looked outside; that [one of the other friends] had driven to Wally's house; that Wally had been smoking marihuana by the picnic table near the little room and had passed it around to the others; that she and Wally had later gone and picked up Wally's brother Mark and someone named Sergio at school; and that Wally had told her that he did not know how [Garza] could be pregnant when she was taking birth control pills and using the patch.

[M.C.] next stated that [the two other male friends and Vela] had been standing around the front of [a] car cleaning some marihuana when they returned to Wally's house; that the group had then started to smoke the marihuana; that she had felt weak, had not smoked with the others, and had sat on the driver's side of the car, that Wally had told her that he was going to call [Garza]; and that she had heard Wally telling [Garza] that he had a surprise for [Garza] when the song being playing ended. She also indicated that [Garza] had pulled up in her red Dodge Neon and said "hi" to everyone; that Wally had then pointed to her; that [Garza] had then come over, given him a hug, and asked if she was high; that [Garza] had then asked her to get out of the car and stand next to her leaning on the picnic table; that she had done so; and that Wally, Mark, [others and Vela] had been about five feet

6

away while she and [Garza] were having their own conversation at that point. [M.C.] further stated that [Garza] had told her that she was pregnant; that she had asked if it was Roy's or Wally's; that [Garza] had looked at her and at the excess water to the back of Wally's house and then asked is she wanted to go for a swim; that she had looked at [Garza], who said that she was just joking; and that [Garza] had then said that it was Wally's baby

[M.C.] further testified that [Garza] had then gone to talk to Wally between the main house and the little room; that Wally had raised his voice and mentioned his appointment; that [Garza] had then come back to talk to her; that [Garza] had picked up a shovel, walked to [a friend], and repeatedly said that she was going to kill [the friend] with the shovel; and that she had not really believed [Garza], who had had a big smile on her face. She also stated that [Garza] had stood next to her, that Wally had gotten her attention; that she had then felt [Garza] hit her on the forehead with the shovel; that she had then fought [Garza] over the shovel; that [Garza] had then screamed, "Now, Wally"; and that Wally had then come up behind her and grabbed her hands behind her back.

[M.C.] next indicated that she had asked what they were doing; that Wally had made her walk backwards and put her in the little room; that [Garza] had just been looking at her with a "real mad face", without saying anything; that [Garza] had shut the door; that Wally had held her down on the couch; and that [Garza] had been putting her hair up in the restroom with the knife Wally always carried open in her hand. She also noted that [Garza] had responded to her inquiry why she was doing this to her by saying that she had "fucked with my relationship"; that she had gotten her right hand loose and grabbed [Garza's] hand with the knife; that [Garza] had split her hand open; that Wally had gotten her hand and again put it behind her back; that [Garza] had gotten really upset that she had grabbed the knife and had started screaming bad words and stabbing her.

[M.C.] then pointed out that the first wounds had been to her neck; that [Garza] had been calling her a bitch and a slut and had been screaming, "How could you, you fucking whore?"; that she had been begging [Garza] and Wally to let her live and had said that Wally didn't mean anything to her; and that she had awakened still on her knees with her hands behind her back, with Wally no longer behind her and [Garza] in the restroom trying to throw up. She also stated that she had begged [Garza] not to hurt her anymore and told [Garza] that she would not tell "them" that they had done this to her; that [Garza] had kept screaming for her to stay there and said that she was going to kill her; and [Garza] had then run outside and yelled "Wally, she's getting away"; and that [Garza] had run after her and told her that she wasn't going to hurt her anymore and was going to take her to the hospital;

7

and that she had then seen Wally's sneakers and felt Wally hit her again like they had hit her with the shovel behind her earlier.

[M.C.] next indicated that she had felt Wally and [Garza] dragging her feet; that she had opened her eyes and seen them dragging her toward Wally's property; that she had grabbed onto the fence; that Wally had left [Garza] there; and [Garza] had kept kicking her head, her arm, and her side and telling her to quit screaming; and that [Garza] had then put one foot on her slit neck and the other one on her chest and started jumping. She also noted that she had been yelling for help while [Garza] was stepping on her and kicking her; that a car had pulled up and [a friend] had asked what was going on; that [Garza] had told [the friend] to get out of here and said that [M.C.] was trying to kill herself; and that she had taken [Garza's] foot off of her neck and told [the friend] that Wally and [Garza] were trying to kill her.

[M.C.] then testified that [Garza] had yelled for Wally; that Wally had come wearing a blood-soaked shirt, that [Garza] had gotten off of her neck, gone toward Wally's house, and told Wally to kill her; that she had begged Wally to let her live; that Wally had knelt near to her and told her to "just let go"; that she had said that she could not; and that Wally had then started strangling her. She also said that she had kept trying to hit and scratch Wally to get him to let her go; that she had then just seen black; that the next thing she remembers is Wally dragging her, seeing her eyes open, and putting his hands around her neck again; that she had felt "them" dragging her and heard something plastic being put around her; and that she felt hands picking her up and heard the trunk close.

[M.C.] next stated that she had heard the car stop, the doors open, and the trunk open; that she had heard someone say that she was still alive; that she had then felt them stab her behind the ear again; that they had had a problem getting the knife out; and that she had felt them pick her up and drop her on the ground. She also indicated that she had recognized [the voices of three males, including Vela's voice]; that she had heard the car drive away and sound like it had gotten stuck; that she had also heard the doors open and close and feet running; that she had then unwrapped herself and prayed that nobody was in the car; that she had found Mark's white shirt and put it behind her ear; and that she had then gotten up and told herself that she was going to make it.

[M.C.] then testified that she had started walking and praying until she eventually reached her boyfriend's uncle; that she had told that person that [Garza] and Wally had done this to her and then passed out; that she had then noticed her father's truck arriving; and that she had then told her father that she had made it. She also stated that her father had told her mother

8

that she was alive; that she had told her mother that [Garza] and Wally had done this to her; that the paramedics had arrived, put her in the ambulance, and taken her to the hospital; that she had been in the hospital for about eight days; that she had received a total of 26 stab wounds, 14 of which were life-threatening; and that she had permanent scars to her hand, both sides of her neck, and her chest and still has problems with her neck pain, back pain, headaches, and her thumb and hand.

John Hovorka, M.D., M.C.'s emergency room physician, testified that M.C. sustained numerous stab wounds and a collapsed lung that was life threatening. Salazar's and Vela's testimony will not be summarized because it is somewhat redundant and not necessary to the final disposition of this appeal. *See* TEX. R. APP. P. 47.1. In her defense, Garza testified that she had gotten into a fight with M.C., Salazar pulled them apart, and then Salazar began stabbing M.C.

The jury charge, which was submitted without objections, asked the jury to determine whether Garza was guilty of attempted murder or aggravated assault if she was directly responsible for stabbing M.C. or responsible because of Salazar's actions. *See* TEX. PENAL CODE ANN. §§ 15.01, 19.02(b)(1). In its instructions, the jury charge included the law of parties and the affirmative defense of duress. *See id.* §§ 7.02(a)(2), 8.05 (Vernon 2003). It did not include any instructions on the accomplice witness rule. *See, e.g.,* TEX. CODE CRIM. PROC. ANN. art. 38.14 (Vernon 2005) ("A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed . . . ."). The jury found Garza guilty of attempted murder and assessed punishment at twenty years' confinement and a $10,000 fine. The trial court rendered a judgment of conviction and sentence in accordance with the jury's verdict and assessment. This appeal eventually followed.

**B.      Standards of Review**

In conducting a legal sufficiency review, we view the relevant evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)); *Escamilla v. State*, 143 S.W.3d 814, 817 (Tex. Crim. App. 2004). The trier of fact is the sole judge of the facts, the credibility of the witnesses, and the weight given to testimony. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979); *Beckham v. State*, 29 S.W.3d 148, 151 (Tex. App.–Houston [14th Dist.] 2000, pet. ref'd). We do not reevaluate the weight and credibility of the evidence, and we do not substitute our own judgment for the trier of fact. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000); *Beckham*, 29 S.W.3d at 151. Instead, we consider whether the jury reached a rational decision. *Beckham*, 29 S.W.3d at 151.

When conducting a factual sufficiency review, we view all of the evidence in a neutral light. *Ladd v. State*, 3 S.W.3d 547, 557 (Tex. Crim. App. 1999). We will set the verdict aside only if (1) the evidence is so weak that the verdict is clearly wrong and manifestly unjust or (2) the verdict is against the great weight and preponderance of the evidence. *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). Under the first prong of *Johnson*, we cannot conclude that a conviction is "clearly wrong" or "manifestly unjust" simply because, on the quantum of evidence admitted, we would have voted to acquit had we been on the jury. *Watson v. State*, 204 S.W.3d 404, 416 (Tex. Crim. App. 2006). Under the second prong of *Johnson*, we cannot declare that a conflict in the

evidence justifies a new trial simply because we disagree with the jury's resolution of that conflict. *Id*. Before finding that evidence is factually insufficient to support a verdict under the second prong of *Johnson*, we must be able to say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the jury's verdict. *Id*. In conducting a factual sufficiency review, we must also discuss the evidence that, according to the appellant, most undermines the jury's verdict. *See Sims v. State*, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

"Appellate courts should afford almost complete deference to a jury's decision when that decision is based upon an evaluation of credibility." *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). "The jury is in the best position to judge the credibility of a witness because it is present to hear the testimony, as opposed to an appellate court who relies on the cold record." *Id*. The jury may choose to believe some testimony and disbelieve other testimony. *Id*. at 707.

## C.    Analysis

The following are the elements of attempted murder: (1) a person, (2) with the specific intent to cause the death of another, (3) does an act amounting to more than mere preparation, (4) but fails to effect the death of the other individual. TEX. PENAL CODE ANN. §§ 15.01(a); 19.02(b); *Roberson v. State*, 144 S.W.3d 34, 38 (Tex. App.–Fort Worth 2004, pet. ref'd); *Jeffley v. State*, 938 S.W.2d 514, 517 (Tex. App.–Texarkana 1997, no pet.). A person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense, she solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. TEX.

11

PENAL CODE ANN. § 7.02(a)(2).

> Garza's legal sufficiency argument is:

> It is uncontested that there is no evidence that with the intent to promote or assist the commission of the indicted offense, [Garza] solicited, encouraged, directed, aided or attempted to aid Wally Salazar to cut or stab the complainant as charged before the occurrence of his last act of his actual or attempted cutting or stabbing, appellant had: (1) hit [M.C.] with a shovel, or (2) obtained the knife for Salazar, or (3) stated that [M.C.] was getting away, or (4) held [M.C.] down on the ground to prevent her escape, or (5) disposed of the knife, or (6) obtained a lighter to set fire to the evidence, or (7) insisted that Salazar set fire to the crime scene,[5] or (8) drove away from the location of the offense.

But, M.C. testified that Garza stabbed her and told her that she was going to kill her. Additionally, Dr. Hovorka testified that the stab wounds which punctured M.C.'s lung were life threatening. Accordingly, there is legally sufficient evidence to support Garza's conviction on a theory of direct responsibility. *See Lee v. State*, 239 S.W.3d 873, 878 (Tex. App.–Waco 2007, pet. ref'd) (holding that a complainant's testimony identifying shooter in an aggravated assault case is legally sufficient evidence to support a conviction). Garza's first issue is overruled.

> Garza's factual sufficiency argument is:

> Although the jury was constitutionally permitted to convict under paragraph 2B's listed "after-the-fact" conduct that with the requisite mens rea, [Garza] began, did and completed after the entire completion of the indicted crime by Wally Salazar, the essence of [Garza's] factual sufficiency claim is that [Garza] did not voluntarily act with intent to promote or assist Salazar's commission of the offense before Salazar completed his unilateral crime of attempting to cause the death of the complainant as noted in the indictment of the grand jury.

We assume, because there are no record citations, that Garza's argument rests on her

---

[5] Salazar testified that after the he left M.C. in the ditch, he burned some blood-soaked clothes and the couch where part of the attack took place.

12

testimony acknowledging a fight with M.C. but denying involvement in the stabbing. M.C., however, testified, *inter alia*, that she tried to flee but Garza yelled to Salazar, "Wally, she's getting away", and that the attack continued.

"The jury is the exclusive judge of the credibility of witnesses and of the weight to be given testimony, and it is also the exclusive province of the jury to reconcile conflicts in the evidence." *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000). In resolving conflicts in the evidence, a jury "may accept one version of facts and reject another or reject any of a witness' testimony." *Baker v. State*, 986 S.W.2d 271, 276 (Tex. App.–Texarkana 1998, pet. ref'd). In this case, the jury apparently accepted M.C.'s verison of the attack over Garza's denial.

We conclude that Garza's factual sufficiency challenge fails because the evidence is not so weak that the jury's verdict is clearly wrong or manifestly unjust, nor is the verdict against the great weight and preponderance of the evidence. Garza's second issue is overruled.

### III. CONCLUSION

The Clerk of this Court is ordered to designate Garza's September 4, 2007 brief as filed. Having overruled Garza's two issues, the trial court's judgment of conviction and sentence is affirmed.

_____
ROGELIO VALDEZ
Chief Justice

Publish. TEX. R. APP. P. 47.2(b)
Opinion delivered and filed
this the 4th day of June, 2009.

13