

# NUMBER 13-09-00068-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**JAVIER CHAVEZ,**                                                                              **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                                      **Appellee.**

---

### On appeal from the 107th District Court
### of Cameron County, Texas.

---

# MEMORANDUM OPINION

### Before Justices Rodriguez, Benavides, and Vela
### Memorandum Opinion by Justice Benavides

Appellant, Javier Chavez, appeals from his conviction of murder.  *See* TEX. PENAL

CODE ANN. § 19.02(b)(1) (Vernon 2003).  By two issues, Chavez argues that the evidence

is legally and factually insufficient to support his conviction.  We affirm.

## I. Background[1]

Luis de Leon ("Commander de Leon"), an investigator with the Cameron County District Attorney's office, testified that on January 19, 2007, he met with Steven Rodriguez concerning a pending case in which Rodriguez was a victim. Commander de Leon stated that Rodriguez was to return on January 22, 2007, to provide some information "on an auto theft ring." Rodriguez never returned to provide that information.

On January 20, 2007, Rodriguez and Trinidad Sanchez were drinking and doing drugs at Sanchez's house at 1200 Milpe Verde, in Brownsville, Texas, where Sanchez lived with his mother and grandmother. At some point that evening, a black Chevrolet Blazer arrived at the house, and Lucio Figueroa and Benjamin Pena exited the Blazer and entered Sanchez's house.[2] Shortly thereafter, Chavez also entered the house. All five men exited the house and proceeded to the front yard.

Sanchez testified that once the men were outside, an unidentified person arrived in a Chevrolet Silverado pickup truck. That person approached Rodriguez and called him a snitch. Figueroa and Pena also called Rodriguez a snitch. Figueroa, Pena, and Chavez then began fighting with Rodriguez. They were hitting him with their fists. Sanchez began arguing with Figueroa, and the man from the Silverado got in his truck and drove off. Sanchez stated that at some point during the fight, Rodriguez ran into the house. However, Sanchez told Chris Ortiz, an officer with the Brownsville Police Department and

---

[1] Because this is a memorandum opinion and the parties are familiar with the facts, we will only discuss the facts as necessary for the resolution of the appeal. *See* TEX. R. APP. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal.").

[2] Lisbeth Garcia testified that she was the owner of the black Chevrolet Blazer, which she bought from her brother, Lucio Figueroa. She stated that during January 2007, Figueroa lived with her and often drove the vehicle.

the lead investigator in the case, that Rodriguez was taken into the house by Enrique Garcia, Sanchez's uncle.

Sanchez further testified that when Rodriguez entered the house, Chavez and Pena ran around the side of the house to the backyard. Sanchez admitted that he did not see what occurred in the backyard and that he was arguing with Figueroa at the time Chavez and Pena ran to the backyard. Sanchez stated that two to three minutes later, Chavez and Pena came running back to the front yard and that one of them said to Sanchez, "You're next." Chavez and Pena then got into the Blazer with Figueroa and left. Sanchez told Officer Ortiz that Chavez was wearing surgical gloves and had bloody hands when he came running from the backyard.[3] Chavez testified that he went into the backyard to "take a leak," and Sanchez admitted that he did not see Chavez with Rodriguez in the backyard. Sanchez also stated that he did not see Rodriguez again after Rodriguez went into the house.

Denise Rodriguez, a dispatcher with the Brownsville Police Department, testified that she was on duty the night of January 20, 2007, and that at about 1:30 a.m. in the morning of January 21, 2007, she received a 911 call from a male who identified himself as Steven Rodriguez. She noted that the caller repeatedly stated that he had been stabbed but did not identify his assailant. She dispatched paramedics to the location Rodriguez gave her.

Julio Briones, an officer with the Brownsville Police Department, testified that he was assigned to investigate a homicide at 1200 Milpe Verde in Brownsville, Texas. He went

_____

[3] This testimony was admitted over a running hearsay objection, and on appeal, Chavez does not challenge the trial court's decision to admit this testimony. *See* TEX. R. APP. P. 38.1(f); *Jaynes v. State*, 216 S.W.3d 839, 845 (Tex. App.–Corpus Christi 2006, no pet.) (stating that an appellate court considers all evidence, both admissible and inadmissible, when reviewing the legal and factual sufficiency of the evidence); *Arzaga v. State*, 86 S.W.3d 767, 778 (Tex. App.–El Paso 2002, no pet.) (same).

3

to the scene, and several other officers were already there. When he arrived, he was directed to a ditch approximately sixty yards behind the house and saw Rodriguez lying in the ditch. Rodriguez had been stabbed multiple times. Officer Briones collected blood samples from the area surrounding the ditch and from the Blazer. Officer Briones was also present during the autopsy of Rodriguez's body and took as evidence some fingernail clippings from Rodriguez's body. On cross-examination, Officer Briones testified that he photographed Chavez at the jail and did not see any signs of Chavez having been in a fight. Officer Briones also stated that he did not find any evidence at Chavez's house connecting Chavez to Rodriguez's murder. Norma Jean Farley, the chief forensic pathologist at Valley Forensics, testified that she performed the autopsy on Rodriguez and that he died in a homicide from the stab wounds.

Dora Lee Palomino testified that she was "seeing" Chavez during January 2007, including on January 20, 2007. On January 21, 2007, between midnight and 1:00 a.m., Palomino received a phone call from Chavez. Chavez was high on drugs, and she spoke with him for five to ten minutes. He asked for money. Later that morning, Palomino met Chavez at a park in Brownsville, Texas. Chavez arrived in the back seat of the Blazer and got into Palomino's car. Chavez told her that he had hurt someone and that he had stabbed someone. He again asked for money and said that he needed money to leave. Chavez told her that he stabbed someone because that person "was messing with his friends." Chavez then exited Palomino's car and left in the Blazer. On January 22, 2007, Palomino picked up Chavez and his brother Ruben Chavez ("Ruben") at Chavez's house. Shortly thereafter, she was pulled over by a Brownsville police officer. On cross-examination, Palomino admitted that she often gave Chavez money for drugs. She also

4

stated that at the time they were seeing each other, Chavez was also seeing another woman.

Ruben testified that he was not with Chavez on the night in question. The State played for the jury a recording of a statement Ruben gave to the police, but that recording is not in the record before us. Ruben testified that the State and the police coerced him into giving the statement. The State then questioned Ruben about some of the statements he made on the recording. Chavez told Ruben that there had been a fight but Chavez did not say he was involved in the fight. Ruben also stated that he had mentioned to the investigators that Chavez had some scratches on him but that Chavez goes fishing and works in construction, implying that those scratches could have been caused by those activities and not from the fight.

Jesse Pinales, an officer with the Brownsville Police Department, testified that on January 22, 2007, he went to Chavez's residence to arrest Chavez pursuant to an arrest warrant. Officer Pinales parked his unmarked vehicle near the residence and observed a vehicle approach the house. Officer Pinales saw a female and two males exit the house, enter the vehicle, and drive off. He observed that the car had a broken taillight and requested a patrol unit stop the vehicle. After the traffic stop occurred, Officer Pinales approached the vehicle and noticed Chavez sitting in the front passenger seat. Officer Pinales then arrested Chavez and took him into custody. Officer Pinales identified Palomino as the driver and Ruben as the back-seat passenger.

On January 22, 2007, Dalberto Luis de Leon, an officer with the Brownsville Police Department, went to Chavez's house. At the house, he met Juan Chavez ("Juan"), Chavez's father. Juan consented to a search of the house, and Officer de Leon searched

the house. He found a suitcase in Chavez's bedroom that had some dress shirts, still on hangers, folded up in the suitcase. Juan told him that the suitcase found in Chavez's room actually belonged to Juan who was packing it in preparation to take Chavez's mom out-of-town for medical treatment. Officer de Leon spoke with Ruben who informed him that the packed suitcase belonged to Chavez who was going out of town to look for work. On cross-examination, Officer de Leon stated that he did not find any evidence relating to the murder, such as bloody clothes or a knife, at the house.

Chavez testified that he was at the house on Milpe Verde the night Rodriguez was murdered but that no fight occurred. He stated that he went behind the house to "take a leak" and that he did not see Rodriguez behind the house. Chavez said that he did not tell Palomino that he stabbed anyone. He claimed that the suitcase found in his room belonged to him and that he was living with his dad because he had recently moved out of his own residence due to a fight with his common-law wife. He claimed that Ruben was lying about Chavez's plans to leave town to look for work and that Ruben was lying about Chavez saying that he was in a fight. Chavez stated that he was a member of the "Vallucos," a protection gang that operates only in prison. He was "one hundred percent" Valluco. Chavez showed the jury a tattoo on his back which read "Valluco" and also discussed a tattoo of palm trees on his hand, stating that they stood for the "Valley." He said that outside of prison, he is a "family man" and that the Vallucos do not have a "code of silence."

Chavez declared that Sanchez was lying about there having been a fight and about Chavez showing up after Figueroa and Pena. He never said that anyone was "next." He further stated that he did not stab Rodriguez and that Palomino was lying when she said

6

that he told her he had been in a fight.

On rebuttal, Dionicio Cortez, a lieutenant with the Cameron County Sheriff's Office in the jail division, testified that he is a classification officer responsible for classifying gang members that come into the jail. Lieutenant Cortez was an expert in gang identification. He stated that while the Vallucos were initially organized as a protection gang and operated only to protect its members while they were in prison, the Vallucos now operate on the "outside" and are engaged in drug smuggling and dealing, burglaries, robberies, and car theft. Lieutenant Cortez testified that the Vallucos do have a "code of silence," which means that the Vallucos threaten snitches with bodily injury and assault and even execute them. Lieutenant Cortez noted that a Valluco is a "fifty percenter" when he enters jail but becomes a "one hundred-percenter" when he enters federal or state prison. A "one hundred percenter" has tattoos of palm trees that form a "V." Lieutenant Cortez testified that the palm trees tattooed on Chavez's hand refer to Chavez's being a "one hundred percenter" and stated that Chavez has "RGV" tattooed on his leg, which stands for "Rio Grande Valley or Rio Grande Valluco." Lieutenant Cortez also discussed a different tattoo on Chavez's leg, which he described as the tattoo of the Valluco "code of silence." Lieutenant Cortez further testified that the Vallucos have formed a car theft ring to provide cars to the Zetas, a powerful, northern Mexico drug gang. Lieutenant Cortez testified that if the Zetas were not happy with someone on the United States side of the border, they would ask the Vallucos to do a hit.

The jury found Chavez guilty of murder, and the trial court sentenced him to life in prison. This appeal ensued.

7

## II. STANDARD OF REVIEW

When reviewing the legal sufficiency of the evidence, we must determine whether "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt'—not whether '[we believe] that the evidence at the trial established guilt beyond a reasonable doubt.'" *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). "[W]e assess all of the evidence "'in the light most favorable to the prosecution.'" *Id.* (quoting *Jackson*, 443 U.S. at 319.) "After giving proper deference to the factfinder's role, we will uphold the verdict unless a rational factfinder must have had reasonable doubt as to any essential element." *Id.* at 518 (citing *Narvaiz v. State*, 840 S.W.2d 415, 423 (Tex. Crim. App. 1992)).

"Evidence that is legally sufficient, however, can be deemed factually insufficient in two ways: (1) the evidence supporting the conviction is 'too weak' to support the factfinder's verdict, or (2) considering conflicting evidence, the factfinder's verdict is 'against the great weight and preponderance of the evidence.'" *Id.* (quoting *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006)). In conducting a factual sufficiency review, we defer to the jury's findings. *Id.* We consider all of the evidence in a neutral light and will "find the evidence factually insufficient when necessary to 'prevent manifest injustice.'" *Id.* (quoting *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997)).

We measure the legal and factual sufficiency of the evidence based on a hypothetically correct jury charge. *Grotti v. State*, 273 S.W.3d 273, 280-81 (Tex. Crim. App. 2008). A hypothetically correct jury charge "accurately promulgates the law, is authorized by the indictment, does not unnecessarily increase the state's burden of proof or restrict the state's theories of liability, and adequately describes the particular offense

8

for which the defendant was tried." *Id.* In a hypothetically correct jury charge, the elements of murder under section 19.02(b)(1) of the penal code are: (1) intentionally or knowingly, (2) causing the death, (3) of an individual. *See* TEX. PENAL CODE ANN. § 19.02(b)(1); *see also Vasquez v. State*, No. 13-05-531-CR, 2008 WL 1822519, at *13 (Tex. App.—Corpus Christi Apr. 24, 2008, pet. ref'd) (memo. op., not designated for publication). Additionally, "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

## III. DISCUSSION

On appeal, Chavez argues that the evidence is legally and factually insufficient to support his conviction. Specifically, he argues that "[n]o physical evidence was introduced at trial which established that . . . Chavez committed the murder of Steven Rodriguez, and only the uncorroborated testimony of an ex-lover and a 'witness' who admitted he was '[h]igh' at the time was introduced in an attempt to implicate [Chavez] in the crime." Therefore, "the evidence is legally [and factually] insufficient to support the jury's verdict." While it is true that "no physical evidence" links Chavez to Rodriguez's murder, we disagree that the evidence is legally and factually insufficient.

The record reveals that Palomino was "seeing" Chavez at the time of the murder. Chavez told her that he had been in a fight and had stabbed someone. On cross-examination, when asked whether she found out that Chavez was "seeing" another woman the entire time he was "seeing" Palomino, Palomino said that she had. Chavez's counsel then inquired whether that fact made Palomino "happy or unhappy." She answered, "It

9

doesn't matter."

Sanchez admitted that he was using drugs and alcohol the night that Rodriguez was murdered. He saw Chavez fighting with Rodriguez and observed Chavez and Pena running to the backyard after Rodriguez went inside the house; however, he did not see what transpired behind the house. Sanchez agreed that he was intoxicated that night and that sometimes when he is intoxicated, he might see and hear things incorrectly. However, on re-direct examination, Sanchez stated that he was able to remember what happened that night and that he was telling the truth.

Chavez contends that the following evidence contradicts Palomino's and Sanchez's testimony: on the 9-1-1 call, Rodriguez did not identify Chavez as his assailant; Dr. Farley did not find any evidence that Rodriguez had been in a fight, even though "[s]ometimes [medical examiners] don't always see contusions if the person dies fairly quickly"; Officer Briones, in his examination of Chavez, did not uncover any evidence that Chavez had been in a fight with anyone; no murder weapon was found tying Chavez to the murder; and none of the blood samples taken from the scene or from the Blazer indicated that Chavez had been fighting with Rodriguez or was otherwise responsible for Rodriguez's murder. Additionally, Chavez stated at trial that he owned the partially packed suitcase and had recently moved out of his own residence. He asserted that, contrary to Ruben's testimony, he was not going out of town.

Despite Chavez's challenges to the above evidence, the record contains other evidence from which the jury could have concluded that Chavez committed the murder. The record contained evidence that Figueroa, Pena, and the man from the Silverado

10

pickup truck called Rodriguez a snitch. Rodriguez was to provide information to Officer de Leon regarding an auto theft ring. Chavez was a member of the Vallucos, a gang that was involved in stealing cars. The Vallucos maintain a "code of silence," which means that snitches are threatened with bodily injury and are sometimes executed. Chavez had a tattoo representing this "code of silence." And, Sanchez told Officer Ortiz that Chavez was wearing surgical gloves and had bloody hands when he came running from the backyard.

All of this evidence and testimony was before the jury, and it is the jury's duty to weigh the evidence and to evaluate the credibility of the witnesses. *See* TEX. CODE CRIM. PROC. ANN. arts. 36.13 (Vernon 2007), 38.04 (Vernon 1979); *Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008). "'Appellate courts should afford almost complete deference to a jury's decision when that decision is based upon an evaluation of credibility.'" *Garza v. State*, 290 S.W.3d 489, 496 (Tex. App.–Corpus Christi 2009, pet. ref'd) (quoting *Lancon*, 253 S.W.3d at 705). Because we rely on the cold record and the jury is present to hear the testimony, the jury is in the best position to judge a witness's credibility. *Id.* "The jury may choose to believe some testimony and disbelieve other testimony." *Id.*

While there is no physical evidence linking Chavez to Rodriguez's murder, there was substantial circumstantial evidence for the jury to consider. *See Clayton*, 235 S.W.3d at 778 (noting that "circumstantial evidence alone can be sufficient to establish guilt"). As we must, we defer to the jury's resolution of the conflicts in the evidence, and we conclude that the evidence is legally and factually sufficient to support the jury's verdict. We overrule Chavez's appellate issues.

## IV. CONCLUSION

Having overruled Chavez's appellate issues, we affirm the judgment of the trial court.

_____
GINA M. BENAVIDES,
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
15th day of July, 2010.