# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00445-CR

**Larry Allen Mize, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF CALDWELL COUNTY, 421ST JUDICIAL DISTRICT
### NO. 2010-246, HONORABLE TODD A. BLOMERTH, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Larry Allen Mize of the offense of theft. *See* Tex. Penal Code Ann. § 31.03(f)(3)(A) (West Supp. 2011). Punishment, enhanced by two prior felony convictions, was assessed at 20 years' imprisonment. In a single point of error, Mize asserts that the evidence is insufficient to prove that he committed the offense. We will affirm the judgment of conviction.

## BACKGROUND

Mize was charged with stealing money from Dorothy Lamb, an 87-year-old woman. The jury heard evidence that on October 20, 2009, Mize knocked on Lamb's door and asked to inspect her garage door. Lamb testified that Mize "just showed up at my house and told me that he would check my garage door opener [for] free." According to Lamb, Mize's demeanor was "very nice" and "very personable." She added, "He got my confidence." After performing the inspection,

Mize proceeded to explain to Lamb that she needed repair work on her garage door, including, in Lamb's words, "a new spring," "some gears or something," and "lubricating." Lamb agreed to the repairs and paid Mize approximately $150 for the work. In February 2010, Mize returned to Lamb's home and told her that additional work on her garage door was needed. Lamb agreed to have the work done and paid Mize $216.88 to complete it. One month later, Lamb recounted, Mize returned and told her that her garage door opener needed to be replaced. Mize then made a phone call in Lamb's presence. During the call, Lamb testified, Mize appeared to order a new garage door opener and inform the person with whom he was speaking that he would have a money order "in the mail in the morning." After ending the call, Mize told Lamb that because he had already ordered the garage door opener, he would need money from her "up front." Lamb testified that she paid Mize approximately $450 and that she was told by Mize that he would return with the garage door opener in "two to four weeks." However, Mize never returned and the garage door opener was never delivered. Over a period of several months, Lamb and her daughter attempted, unsuccessfully, to contact Mize and get him to deliver and install the garage door opener as he had promised.

"In the meantime," Lamb testified, her current garage door opener "had gone out and didn't work." Lamb eventually obtained a new garage door opener from a company in Seguin for approximately $100 less than what Mize had charged. According to Lamb, when a representative from the Seguin company came out and inspected her garage door opener, he told her that it had been "wired all wrong." Lamb also testified that before Mize had inspected and worked on her garage door, she had never encountered any problems with it.

Receipts and invoices showing the amounts Lamb had paid to Mize and the products and services for which she had paid were admitted into evidence. Also admitted into evidence were

2

copies of a business card that Mize had given to Lamb. The card contains Mize's name, the name of an apparently fictitious company, "Countrywide Garage Doors,"[1] and two phone numbers for the company, one located in the Victoria and Rockport area, and the other located in San Antonio. Lamb testified that she made numerous calls to these numbers inquiring into the status of her order.

When Lamb called the numbers, she was directed to an answering service. Lamb testified that Mize "would call me back sometimes, and sometimes he wouldn't." According to Lamb, when Mize did return her calls, he provided excuses for his failure to deliver the garage door opener. During one such call, Lamb testified, Mize told her, "You have a garage door opener, but these people down here don't have one."[2] As Lamb continued making calls to the numbers Mize had provided to her, the answering service operators eventually began telling Lamb to stop calling. When Lamb called the San Antonio number, she was told, "Don't you call us again. He's not a customer of ours." When Lamb called the Victoria number, she was told, "We've had too many complaints. I'm going to have to talk to my supervisor." And during another call, Lamb was told, "Lady, I would advise you to go file charges with your police department."

Eventually, Lamb did so. Detective Kenneth Schmidt of the Luling Police Department conducted an investigation and interviewed Lamb. According to Schmidt, Lamb told him that in the seven to eight months since she had paid for the garage door opener, she had not

---

[1] A certificate from the Office of the Texas Secretary of State was admitted into evidence showing that "a diligent search of the records of this office was performed on the name Countrywide Garage Doors" and that "[t]here is no record of a domestic corporation, professional corporation, professional association, limited partnership, limited liability partnership, or limited liability company by the name searched."

[2] The record is unclear as to whom Mize was referring, although Lamb testified that she believed Mize was calling her from Palacios, which is a city near the coast and southeast of Victoria.

received it. Schmidt also testified that door-to-door solicitors need a permit to do business in Luling and that Mize had no such permit.

During the investigation, Detective Schmidt learned of another woman, 74-year-old Betty Sue Blackwell Townes, a neighbor of Lamb's, who had reported a similar incident to the police. Townes testified during trial. According to Townes, Mize showed up at her house one day and asked her if she was having any problems with her garage door. After Townes told him that she was having some problems with it, Mize agreed to fix it for a fee of either $20 or $30. At some later date, Townes recalled, Mize returned and told her that she needed a new garage door opener "because this one might catch on fire." This caused Townes particular concern because she kept oxygen tanks in her house. She explained, "And that's not a good thing, [] fire. I mean, you go boom and all that." Townes wrote Mize a check for $451 for a new garage door opener. Townes testified that Mize told her that she would receive the garage door opener "soon" but did not specify an estimated date of delivery. However, Townes did not see "hide nor hair" of Mize again. She added that her garage door opener was still working properly and that "it ain't caught on fire, either." Townes began to suspect that Mize had defrauded her when she called his answering service and was told, "We don't know where he is."[3]

The jury also heard testimony from Jason Burmeister, the owner of the company that had provided answering services to Mize from 2009 through July 2010.[4] Through the answering service, numerous calls were made to Mize, many of them complaints. Written summaries of

[3] During her testimony, Ms. Townes also acknowledged that she was the Betty Sue Blackwell who had been Luling's first Watermelon Thump Queen.

[4] Burmeister testified that the company terminated its services to Mize at that time due to Mize's failure to pay for the services.

these calls were admitted into evidence. Two of the calls were from Lamb and expressed her unhappiness with Mize's failure to install her garage door opener. Summaries of multiple calls from other dissatisfied customers were also admitted into evidence.[5]

Also admitted into evidence were account statements from Texas Dow Employees Credit Union, where Mize had a d/b/a account for Countrywide Garage Doors. The statements, which reflect account activity from April to September 2010, show several large deposits into and numerous withdrawals from the account. Luke Billeri, the regional vice president of the credit union, testified that the withdrawals appeared to be for purchases made at hotels, restaurants, bars, and even an amusement park. However, according to Billeri, the statements did not reflect any withdrawals for the purchase of a garage door opener.

The jury found Mize guilty of the offense of theft as charged, and the district court assessed punishment as noted above. This appeal followed.

**STANDARD OF REVIEW**

In reviewing the sufficiency of the evidence to support a criminal conviction, we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences to be drawn therefrom, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). This

---

[5] The summaries of these calls included: "Garage door that you know about that is still out of adjustment"; "Garage door is still not fixed properly. Please call"; "As per caller, garage door is still not working after you have completed repairs"; "Purchased motor from you and has not yet received it"; and "Has been waiting a month on the garage door."

5

standard gives full play to the responsibility of the trier of fact to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *see Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007). "Reviewing courts are not fact finders. Our role is that of a due process safeguard, ensuring only the rationality of the trier of fact's finding of the essential elements of the offense beyond a reasonable doubt." *Allen v. State*, 249 S.W.3d 680, 688 (Tex. App.—Austin 2008, no pet.) (Onion, J.). The trier of fact "is in the best position to judge the credibility of a witness because it is present to hear the testimony, as opposed to an appellate court who relies on the cold record." *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). Therefore, when faced with conflicting inferences, a reviewing court must presume that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution. *Jackson*, 443 U.S. at 326; *Turro v. State*, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993). If any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, we must uphold the verdict. *See McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997); *Cuong Quoc Ly v. State*, 273 S.W.3d 778, 781 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd).

## ANALYSIS

A person commits the offense of theft if he unlawfully appropriates property with intent to deprive the owner of the property. Tex. Penal Code Ann. § 31.03(a). Appropriation of property is unlawful if it is without the owner's effective consent. *Id*. § 31.03(b)(1). Consent is not effective if induced by deception or coercion. *Id*. § 31.01(3)(A) (West Supp. 2011). In this case, "deception" means "promising performance that is likely to affect the judgment of another in the

6

transaction and that the actor does not intend to perform or knows will not be performed, except that failure to perform the promise in issue without other evidence of intent or knowledge is not sufficient proof that the actor did not intend to perform or knew the promise would not be performed." *Id*. § 31.01(1)(E).

Mize asserts that the evidence is insufficient to prove the element of deception as defined above. Specifically, Mize claims that he did nothing more than fail to perform the promise he had made to Lamb and that he had no intent to deceive her. *See, e.g.*, *Peterson v. State*, 645 S.W.2d 807, 812 (Tex. Crim. App. 1983) (holding that when "money . . . was voluntarily given to appellant pursuant to a contractual agreement, [and] there is insufficient evidence in the record to show the money was obtained by deception, the conviction cannot stand"); *Phillips v. State*, 640 S.W.2d 293, 294 (Tex. Crim. App. 1982) (holding that evidence that defendant failed to perform promise is insufficient evidence of deception). The State responds that the evidence was sufficient to prove that Mize was essentially a "con man" who preyed on Lamb and other elderly individuals by gaining their trust, convincing them that they needed his services, and then taking their money without performing the services that he had promised them.

We agree with the State. The record in this case provides sufficient evidence from which a rational jury could reasonably infer that Mize had an intent to deceive Lamb. This evidence, which we have summarized more extensively above, includes:

> Evidence tending to show that Mize was not who he claimed to be. A business card that Mize had given to Lamb made it appear that Mize worked for a company named Countrywide Garage Doors, with offices in Victoria, Rockport, and San Antonio. However, according to a certificate from the Texas Secretary of State's Office, no such company exists in Texas. Also, according to Detective Schmidt, door-to-door solicitors need a permit to do business in Luling, but Mize had no such permit.

7

Evidence tending to show that Mize may have manipulated Lamb's old garage door opener in order to convince her that she needed a new one. Lamb testified that she had no problems with her garage door before Mize had inspected it but that the garage door opener had stopped working after Mize had handled it. According to Lamb, a garage door specialist later told her that it had been "wired all wrong."

Evidence tending to show the manner in which Mize had first approached Lamb, gained her trust and confidence, and then, after accepting a final payment from her, essentially disappeared without performing the service he had promised. Lamb testified that first, Mize had offered to inspect her garage door for free; next, he had asserted that certain minor repairs were needed (even though Lamb had not noticed any problems with her garage door); and finally, he had claimed that Lamb needed a certain product, demanded that the money for that product be paid "up front," and, once he had obtained the money, was never seen by Lamb again.

Evidence tending to show that it was difficult for Lamb to contact Mize. Lamb testified that although Mize would sometimes return her calls, many times he did not respond to either Lamb's calls or her daughter's emails. Furthermore, according to Lamb, the operators of the answering service that Mize had used at the time eventually asked Lamb to stop calling them because they had received "too many complaints" regarding Mize and advised her to "file charges with your police department."

Evidence tending to show that Mize had made withdrawals from his "d/b/a Countrywide Garage Doors" account for recreational purchases but not for the purchase of a garage door opener.

Evidence tending to show that Mize's failure to perform the service he had promised to Lamb was not an isolated incident but was instead indicative of a pattern of deceptive conduct committed against Lamb and other victims. This evidence included the written summaries of numerous calls that Mize's answering service had received, many of which involved complaints regarding Mize's failure to perform the services he had promised. Other such evidence included the testimony of Betty Townes, Lamb's neighbor, who had reported an incident involving Mize similar to Lamb's experience. According to Townes, Mize had told her, after performing minor repairs on her garage door, that she needed a new garage door opener because her current one "might catch on fire"; had received payment from her for a new garage door opener; and then, as he did with Lamb, had disappeared without delivering the garage door opener.

8

When considering the totality of the above evidence and other facts in the record, the jury could have reasonably inferred that: (1) Mize had intended to deceive Lamb into believing that he was employed by an actual company that specialized in garage doors when, in fact, he did not; (2) Mize was not a legitimate businessman but was instead, as the State alleged, a "con man" who was attempting to deceive unsuspecting individuals, including Lamb, into giving him money for services and products that they did not need; (3) from the moment he had first knocked on Lamb's door, Mize intended to deceive Lamb into purchasing a garage door opener that he knew he would not deliver; and (4) Mize had intended to deceive Lamb in a manner similar to how he had deceived others, including Lamb's neighbor, Ms. Townes.

Viewing the above evidence and all reasonable inferences therefrom in the light most favorable to the verdict, we conclude that a rational jury could have found the element of deception beyond a reasonable doubt. Accordingly, the evidence is sufficient to prove that Mize committed the offense of theft as charged. We overrule Mize's sole point of error.

## CONCLUSION

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Rose

Affirmed

Filed: April 27, 2012

Do Not Publish

9