

# NUMBER 13-12-00059-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**NIGEL PAUL GARDNER,**                                    **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                       **Appellee.**

---

### On appeal from the 258th District Court
### of Polk County, Texas.

---

# MEMORANDUM OPINION[1]

### Before Chief Justice Valdez, and Justices Benavides, and Perkes
### Memorandum Opinion by Justice Perkes

Appellant Nigel Paul Gardner appeals his conviction for murder, a first-degree

felony, *see* TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011); and retaliation, a

third-degree felony, *see id.* § 36.06(c). A jury found appellant guilty on both counts, and

---

[1] This case is before this Court on transfer from the Ninth Court of Appeals in Beaumont pursuant to an order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2005).

the trial court assessed punishment at seventy-five years' confinement in the Texas Department of Criminal Justice, Institutional Division for murder and at ten years' confinement for retaliation, with the sentences to run concurrently. By two issues, appellant argues the evidence is insufficient to convict him. We affirm.

## I. BACKGROUND[2]

Eric Scroggins testified that on October 5, 2010, appellant asked him to help appellant "get rid" of a vehicle. Scroggins agreed to help. Scroggins, driving his 1989 Ford Mustang, followed appellant, who was driving his stepfather's red Pontiac Sunfire. Scroggins followed appellant until they reached some "water tanks," at which point appellant continued past the tanks in the Pontiac Sunfire and stayed out of view for about five minutes before walking back to Scroggins' vehicle. They left in Scroggins' vehicle.

The "water tanks" actually was a tank and pump battery associated with an oil well operated by "Alta Mesa Services." Two employees of that company described seeing Scroggins' vehicle driving away from the direction of the oil well on October 5th. They thought it was odd that a small car would be driving on that section of road, which they described as unpaved, sandy, and "not really conducive to a small car . . . ." They noted that the driver turned his face away from them as they passed him, and one employee testified that the driver held his hands in front of his face.[3] They did some work at the well, but did not see anything else unusual.

---

[2] Because this is a memorandum opinion and the parties are familiar with the facts, we will not recite them here except as necessary to advise the parties of the Court's decision and the basic reasons for it. *See* TEX. R. APP. P. 47.4.

[3] One of the employees told the sheriff's department that he believed there was a second person in the car besides the driver, but stated, on cross-examination, that he could "not positively" tell the jury that a second person was in the car. The other employee testified that he only saw one occupant in the other

Later that afternoon, local fire departments were dispatched to a large fire near the oil well. Jay Barbee, an arson investigator for the Polk County Fire Marshal, testified that the fire originated from within a vehicle that the firemen discovered at the scene. In the back seat of the burned vehicle, a Pontiac Sunfire, the firemen found the dead body of Raymond Howell, appellant's stepfather.

Prior to this incident, appellant had openly discussed his strong dislike of Howell. Ann Damon, who dated appellant until 2008 or 2009, testified that appellant disliked Howell because Howell "caused some kind of thing where [appellant] had went back to prison, a violation of his probation." According to Damon, appellant broke into Howell's house while on probation, and Howell "called the law on him and that was a violation of his probation. He had filed charges on him for breaking and entering, and that's the reason why [appellant] went back to [prison] to begin with." The trial court took judicial notice that (1) appellant was convicted of burglary of Howell's habitation in 2000; (2) appellant received ten years' probation; (3) appellant's probation was revoked in 2002; and (4) appellant was confined for seven years. Appellant told Damon that "[h]e couldn't stand that fat bastard" and that Howell was "going to get what's come to him in the end. I'll beat his a__. I'm not scared of him."

Karen Leanne Johnson, a friend of Damon who saw appellant "on a daily basis" while he was dating Damon, confirmed that appellant hated Howell after Howell "sent him to prison. He was on probation and he had sent him back to prison." Johnson also affirmed that appellant made threatening statements about Howell, saying "he [Howell] would get his one day" and appellant would "get him."

vehicle but his "focus . . . was one that was kind of an unusual car to see out there."

3

In July 2010, Charlotte Champagne, an employee of the State's Adult Protective Services Program, interviewed appellant while investigating allegations that appellant and his girlfriend at that time, Edna Lynn Harris, were exploiting and taking advantage of appellant's grandmother for financial gain. During that interview, appellant became hostile toward Howell and his mother. He "blamed them," alleging "it was their fault that he had gone to [prison] for burglary of a habitation of their home, and he indicated that he believed that . . . he knew who made the report and was talking about them at the time and said that he was going to get them for it." Harris testified that appellant was angry about the alleged elder abuse and attempted to contact Howell on the day of "being investigated." Harris also confirmed that appellant disliked Howell because Howell was responsible for "putting him in the pen . . . ."

Dr. Stephen Wilson, an assistant medical examiner at the Harris County Institute of Forensic Sciences, performed the autopsy of Howell's "severely charred" body. He found two, small-caliber bullets ("less than a quarter inch in diameter") and two bullet holes in Howell's skull. He opined that Howell died from the two gunshot wounds prior to being burned because there was no soot in Howell's air passage. Dr. Wilson would have expected to find soot if Howell had been breathing "at the time of the fire . . . ."

Detective Rickie Childers, a detective captain at the Polk County Sheriff's Office, obtained a search warrant for the residence where Howell frequently stayed during the workweek, 158 Wolf Den. Inside, officers observed a couch with blood on the armrest, which also had a "possible bullet hole." Detective Childers and Texas Ranger Grover Franklin Huff, who assisted searching the residence, explained how they cut and peeled

4

back the outer material of the couch to observe a bullet trajectory. Ranger Huff searched for latent blood, and found a spot "several feet in front" of the couch "where either possibly a bloody object had been drug across . . . or where something had been wiped through [a] bloodstain." No weapon or shell casings were recovered.

Harris, appellant's ex-girlfriend at the time of Howell's death, testified that during the weekend prior to Howell's death—September 30th to October 3rd—she was visiting appellant, and that appellant threatened her with an "old looking" revolver that had "little," "thin" bullets. Harris testified that at the time of Howell's death, appellant was staying with Chris Griffith in a mobile home, which appellant and Harris previously purchased from appellant's grandmother, and which they conveyed to Griffith.[4] The mobile home was, according to Detective Childers, about fifty yards away from 158 Wolf Den. Investigating officers found a paper towel on a trail between the two residences that tested positive for two DNA profiles: one was consistent with Howell's DNA profile; and appellant could not be excluded as a contributor of the other DNA profile.[5]

Harris claimed appellant's grandmother gave 158 Wolf Den to appellant and her.[6] Harris stated that appellant made several attempts to reconcile with her, but that Harris "wanted him to get a job and get his own place" before they "work[ed] on getting back together." Part of the plan of her returning to Livingston, where appellant lived, was "to

---

[4] The Polk County Sheriff's Office found a Bill of Sale, conveying the property from appellant's grandmother to appellant and Harris, while searching the residence in a separate search.

[5] Tonya Dean, the regional forensic DNA specialist at the Texas Department of Public Safety Crime Lab in Houston, stated, "The probability of selecting an unrelated person at random who could be a contributor to this [the second] DNA profile is approximately 1 in 8 for Caucasian [persons], 1 in 7 for Black [persons], and 1 in 13 for Hispanic [persons]."

[6] Donna Howell testified that appellant's grandmother owned both the mobile home and the residence at 158 Wolf Den. She was not aware of her conveying any property to appellant and Harris.

use the piece of paper that we had to get [Howell] to leave" 158 Wolf Den, so Harris could stay there. According to Harris, appellant called her on October 5th and told her, "I got rid of Ray [Howell]. Ray isn't a problem anymore."

Appellant's phone call to Harris came from a pay phone at a gas station. Several witnesses, including Griffith, claimed to see appellant arrive at the gas station in a red Pontiac Sunfire on October 5th. Sharon Nerren asked appellant who owned the Pontiac Sunfire. He responded that it was a friend's car.

Griffith testified that about one week before Howell's death, appellant asked him, "[W]hat would you do if you had to get rid of a body . . . [?]" Griffith stated that on October 4th, appellant left Griffith's mobile home, where appellant was staying at that time, saying that "he just saw Ray [Howell] drive by[] and he was going to talk to him." Griffith saw appellant on the following day, driving Howell's Pontiac Sunfire. According to Griffith, on October 6th, appellant told him that he contacted the sheriff's department to get Howell to vacate 158 Wolf Den because appellant had a bill of sale for it. Appellant also told him that the sheriff's department asked Howell to leave, prompting Howell to load "some of his stuff" in his car and leave.

Lieutenant Craig Finegan of the Polk County Sheriff's Office was the primary case agent on Howell's murder. He testified that, after investigating the sheriff's office intake reports, there was no evidence that appellant had ever contacted the sheriff's department or asked for its assistance in evicting Howell.

6

## II.  SUFFICIENCY OF THE EVIDENCE

By two issues, appellant argues that the evidence was insufficient to convict him for each indicted offense.

### A.      Standard of Review

"The standard for determining whether the evidence is legally sufficient to support a conviction is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Johnson v. State*, 364 S.W.3d 292, 293–94 (Tex. Crim. App. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see Brooks v. State*, 323 S.W.3d 893, 898–99 (Tex. Crim. App. 2010) (plurality op.).  The fact-finder is the exclusive judge of the credibility of witnesses and of the weight to be given to their testimony.  *Anderson v. State*, 322 S.W.3d 401, 405 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) (citing *Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008)).  Reconciliation of conflicts in the evidence is within the fact-finder's exclusive province. *Id.*  (citing *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000)).  We must resolve any inconsistencies in the testimony in favor of the verdict.  *Id.* (citing *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000)).

We measure the sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge.  *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).  Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily

restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.*

### B. Murder

A person commits murder by intentionally or knowingly causing the death of another. TEX. PENAL CODE ANN. § 19.02(b) (West 2011). A person acts intentionally "with respect to . . . a result of his conduct when it is his conscious objective or desire to . . . cause the result." *Id.* § 6.03(a). A person acts knowingly "with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 6.03(b). Intent or knowledge may be inferred from a defendant's acts, words, conduct, and the method of committing the crime and the nature of the wounds inflicted on a victim. *See Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002) (en banc) (quoting *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App.1999)); *Linden v. State*, 347 S.W.3d 819, 822 (Tex. App.—Corpus Christi 2011, pet. ref'd).

The evidence presented to the jury that connected appellant with the murder of his stepfather was substantial. Appellant asked Griffith how Griffith would dispose of a body about one week before his stepfather's disposed-of body was found. Appellant asked Scroggins to help him get rid of a vehicle, which belonged to his stepfather, even though testimony showed that appellant did not own a vehicle and that he could have used the car rather than abandon it. The car that appellant abandoned was later found with his stepfather's body in it. Barbee, the arson investigator, testified that the fire originated from within the vehicle. Two witnesses saw Scroggins' car driving away from the general area where Howell's body was discovered. Appellant lied to Nerren, telling her that his

8

father's Pontiac Sunfire belonged to a friend; and he lied to Griffith, telling him that Howell was forced by the sheriff's department to leave when, according to Lieutenant Finegan, there was no evidence appellant contacted the sheriff's office.  Appellant told Harris that he "got rid of" Howell on the day that Howell's body was discovered.  Harris testified that appellant threatened her with a small-caliber revolver a few days before Howell's death and a few days before Dr. Wilson found two small-caliber bullets in Howell's skull, which he opined was the likely cause of Howell's death.  In addition, police officers found blood and a possible bullet hole in a sofa at 158 Wolf Den, the residence where Howell was staying and where Harris testified she needed to stay if she was going to move back to the area; she told appellant that she would not live with him and two other men in a trailer, so appellant told her that 158 Wolf Den was "the only place I [Harris] had to stay."

After viewing the evidence in the light most favorable to the prosecution, we hold that a rational trier of fact could have found the essential elements of murder beyond a reasonable doubt.  *See Jackson*, 443 U.S. at 319; *see also Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) ("Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction.").  We overrule appellant's first issue.

## C.    Retaliation

A person commits the offense of retaliation when he "intentionally or knowingly harms or threatens to harm another by an unlawful act in retaliation for or on account of the service or status of another as a person who has reported or who the actor knows

intends to report the occurrence of a crime . . . ." TEX. PENAL CODE ANN. § 36.06(a)(1)(B) (West 2011). "Harm" means anything reasonably regarded as loss, disadvantage, or injury. *See id.* § 1.07(a)(25). A jury may infer that a defendant intentionally or knowingly harmed or threatened to harm another from the defendant's acts, words, and conduct. *See Moore v. State*, 143 S.W.3d 305, 310 (Tex. App.—Waco 2004, pet. ref'd) (citing *Hart*, 89 S.W.3d at 64).

A rational jury could have found that appellant intentionally or knowingly harmed Howell; murder is harm. Regarding appellant's motive, Damon related how appellant told her that Howell was "going to get what's come to him," and Johnson repeated appellant's statements that Howell "would get his one day" and that appellant would be the one to "get him." Both witnesses, and Harris, noted that appellant's hostility resulted from Howell's decision to report appellant's burglary, which caused appellant's probation to be revoked and for appellant to be incarcerated for seven years. In addition, Champagne of the Adult Protective Services testified that appellant blamed Howell and appellant's mother for his incarceration and for the elder abuse report. According to Champagne, appellant believed that he "knew who made the report" and claimed he was "going to get them [Howell and appellant's mother] for it."

Based on the foregoing evidence, we conclude a rational jury could have found that appellant killed Howell in response to Howell reporting appellant's burglary offense. *See Moore*, 143 S.W.3d at 310 (holding a jury may infer from the defendant's acts, words, and conduct whether he intentionally or knowingly harmed another); *see also Hooper*, 214 S.W.3d at 13 (ruling that appellate courts affirm the jury's conviction as long as the

cumulative force of the evidence supports it); *Anderson*, 322 S.W.3d at 405 (requiring deference to the jury as the exclusive judge of the witnesses' credibility and the weight to be given their testimony, and holding that reconciliation of conflicts in the evidence is exclusively reserved for the jury). We hold that a rational trier of fact could have found the essential elements of retaliation beyond a reasonable doubt. S*ee Jackson*, 443 U.S. at 319. We overrule appellant's second issue.

### III. CONCLUSION

We affirm the trial court's judgment.


GREGORY T. PERKES
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
11th day of July, 2013.